## Brent v. Gay, et al.

(Decided October 3, 1912.)

### Appeal from Clark Circuit Court.

1. Contracts—Contract in Restraint of Trade, What Is.—Where a number of persons associate themselves together for the purpose of controlling the market for a specified commodity, and to fix the price at which it shall be sold, as well as to suppress competition by other dealers, the agreement will be treated as an illegal and unreasonable restraint of trade, and the combination will not have the aid of the courts to enforce an executory contract that would enable it to more successfully accomplish the purpose of its creation.

2.  Contracts—Contract in Restraint of Trade.—Where several deal-
    ers of a commodity enter into an agreement to control the mar-
    ket and fix the price of the commodity, and in pursuance of this
    plan contracted through an agent, who did not disclose his prin-
    cipal, with an independent dealer for a quantity of the com-
    modity, a suit against the dealer for damages for failure to per-
    form the contract cannot be maintained, as the court will not
    lend its aid to enforce a contract that has for its purpose the un-
    lawful restraint of trade.

PENDLETON, BUSH & BUSH and HARMON STITT for appel-
lant.

JOUETT & JOUETT, TALBOTT &  WHITLEY and JOHN T.
SHELBY for appellees.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

The appellees Gay and others, who where plaintiffs
below, brought this suit against appellant Brent to re-
cover damages for breach of contract.

The petition set out in substance that the plaintiffs
David S. Gay, J. S. Wilson, and E. F. Spears & Son, on
June 1, 1906, entered into written articles of partner-
ship to do business under the style of the Central Ken-
tucky Blue Grass Seed Company, and that Prunty, a
co-plaintiff, entered into a contract with the defendant
Brent, by which Prunty bought and defendant sold to
him 15 tons of 20 lb. extra fancy Kentucky Blue Grass
seed to be delivered in September, 1906, at $1.30 per
bushel of 14 pounds. That on September 1, 1906,
Prunty assigned the contract to E. F. Spears & Son for
the benefit of the Central Kentucky Blue Grass Seed
Company. That the plaintiffs were ready, willing and
able to perform their contract, and offered so to do, but
that the defendant refused and failed to perform his
contract. That at the time the seed was to have been
delivered under the contract, namely, in September,
1906, the market price of seed had advanced 38 cents per
bushel, and that had the defendant performed his con-
tract the plaintiffs would have realized a profit of 38
cents per bushel on the seed, and that by reason of his
failure to comply with his contract they were damaged
in the sum of $814.28, for which amount they asked
judgment.

To this petition, an answer and amended answers
were filed; and, after the demurrers to the defense in-

terposed had been disposed of, the case was submitted, and judgment went against appellant Brent for the amount asked for, and he prosecutes this appeal.

The articles of partnership referred to in the petition, and which were signed by C. F. Spears & Son, James S. Wilson, and David S. Gay, read in part as follows:

"We, the undersigned, do hereby organize ourselves into an association which shall be known as the Central Kentucky Blue Grass Seed Company, and its purpose shall be the buying and selling of Blue Grass seed of the crop of 1906 only on joint account.

"The capital stock shall be five hundred dollars ($500) which shall be subscribed to in equal amounts by the three members. The officers of the company shall be Secretary and Treasurer. Any one member can call a meeting to transact business. The majority of votes shall control the buying and selling and all questions presented.

"All members shall share and share alike in profit and losses resulting from the business.

"This agreement shall continue in force from this date, June the first, 1906, to May the first, 1907.

"None of the members of this company shall sell stripped seed to another than a member unless by special permit from the other members, except in lots of one hundred (100) bushels or less to neighboring farmers. Gains from such sales to be turned into association. * * *

"The cleaning shall be divided equally. The cleaners are to furnish all money necessary for handling the seed they clean. The cleaners are to be paid at the rate of six per cent interest, per annum on all money due them from reports of seed cleaned and other bills accepted by the company. * * *

"No sales or purchases are to be made in the name of the company. Members in making sales shall assume personally the risk of loss from not collecting account or otherwise. * * *

"Each member agrees to ship no seed that has not first been formally turned into the company.

"Inspector or inspectors may be appointed any time to examine or verify the count of stock held by members. * * *

"The first part of each week, not later than Tuesday, cleaners are to send in to the secretary their bills for such cleaned seed cleaned during the week, statement of stock of cleaned seed and rough seed on hands, quantity of rough seed bought but not delivered, and quantity of cleaned seed sold for future shipment.   *   *   *

"Should any member, with the consent of the others, contract to clean for anyone else, it is understood that the amount of seed so contracted to be cleaned shall be divided equally unless all members can agree on basis whereby the member so contracting shall clean it all. * * *

"In regard to the old stock, it is understood that unless members can agree on basis that it shall be turned over to the company. The holding of it shall be controlled by the company and five cents per bushel shall be allowed them for the selling and sales shall be in proportion that number of bags of old seed bears to number of bags of new seed handled by the company during the season.

"The price of cleaning shall be figured at seventy-five (75) cents per bushel for stripped seed and one dollar and twenty-five ($1.25) per bushel for fancy. If stripped seed is bought for less than seventy-five (75) cents per bushel, the cleaner pays the difference to the company. If stripped seed costs more than seventy-five (75) cents per bushel, the company pays the difference to the cleaner. D. S. Gay is elected treasurer; J. S. Wilson, secretary with salary of one hundred ($100) dollars.

"Seed bought by members from the stripper shall be figured to the company at seventy-five (75) cents per bushel, dry, F. O. B., Paris or Winchester."

To fully understand the nature of the defense set up by Brent, it will be necessary to set out so much of his answer and amended answer as present the questions for decision in this case.

In the answer, Brent charged in substance that C. E. Prunty, acting as the agent of the Central Kentucky Blue Grass Seed Company, in its effort to control the Blue Grass seed market, purchased from him the seed in question, concealing from him the fact that he was acting as such agent and leaving him under the impression that he was buying the seed on his own account. He further averred that this concealment of his agency was a part of a fraudulent scheme devised by the Central Kentucky Blue   Grass Seed Company to purchase seed

from him and others, and that he would not have sold the seed to the Central Kentucky Blue Grass Seed Company or to Prunty or any person representing or acting as the agent for the company if he had known of such agency. He also averred that this fraudulent scheme, devised by the company for the purpose of securing the seed purchased by Prunty, was an effort to form a pool and trust of the Blue Grass market, in unreasonable and unlawful restraint of trade, and that these facts invalidated the contract.

In an amended answer he averred:

"That prior to June 1, 1906, when the agreement copied in the petition was alleged to have been entered into, the said plaintiffs, E. F. Spears & Sons, J. S. Wilson and David S. Gay, were separately and independently engaged in the business of buying up, cleaning and manufacturing the rough Blue Grass seed grown in the State of Kentucky and elswhere into what is known as cleaned and dressed Blue Grass seed, and in selling, shipping and delivering the same, * * * and were at the same time prior to said date in competition one with the other in the said State, interstate and foreign commerce. * * * that by far the greater portion of Blue Grass seed is grown and so manufactured into cleaned seed in Kentucky and shipped from Kentucky to the markets of the world; that the said three plaintiffs in their several businesses carried on and did a large portion of said trading in Blue Grass seed and by the said combination formed through said contract of June 1, 1906, they were able to control and monopolize a large portion of said Blue Grass seed business done in the State of Kentucky, but were not at that time fully able to act as a complete monopoly; that only a small quantity of Blue Grass seed is grown outside of the State of Kentucky and practically all of the Blue Grass seed that is grown in the world is cleaned and manufactured into dressed seed in Kentucky, and thus prepared for market, * * * that the cleaners and manufacturers of Blue Grass seed, if they are combined in Kentucky or controlled by one head, can regulate and control absolutely the price of Blue Grass seed in the markets of the world, and that the plaintiffs signed, executed and delivered the alleged agreement of copartnership of June 1, 1906, set out in the petition, and entered into the same for the purpose and with the in-

tent, and by entering into said agreement they did thereby, form and create a pool, trust, combine, agreement, confederation and undertsanding with each other and one with the other for the purpose of regulating, controlling and fixing the price of Blue Grass seed, and to enhance, and they did so enhance and raise the price and cost thereof above its real value, but that at the said time on June 1, 1906, when said agreement was entered into between the plaintiffs, it was a part and parcel of said trust and pool, plan and arrangement between the plaintiffs, that they would secure further and complete control and monopoly of the Blue Grass seed market, and thus perfect their combination, so that they would thereby be enabled to have absolute control of the said market and to fix absolutely and arbitrarily exorbitant prices on said manufactured article, * * * that the purchase of the one car load of seed sued on herein in the name of the said C. E. Prunty was one of the many purchases so undertaken to be made at that time to carry out said general plan aforesaid; that several other orders for large lots of seed were made at about the same time by using the names of other jobbers, and were attempted to be secured from this defendant, though this suit only involves the one order of the said C. E. Prunty; that by this arrangement by the said plaintiffs and attempted purchase with the said C. E. Prunty, the said plaintiffs and the said C. E. Prunty did thereby form an agreement for the purpose and with the intent to pool, and by entering into the same they did thereby form and create a pool, trust, combine, agreement, confederation, and understanding with each other and one with the other for the purpose of regulating, controlling, and fixing the price of Blue Grass seed to, and they did, enhance, the price and cost of said Blue Grass seed above its real value, and immediately thereafter they, the said plaintiffs, did arbitrarily raise the price and cost of Blue Grass seed above its real value.''

To this answer a general demurrer was sustained. Other answers were filed, presenting other defenses, but we do not think it important or necessary to notice or comment on the issues made by them, as we have reached the conclusion that the substantial defenses relied on by Brent were presented in the answer from which we have made copious extracts and to which the

demurrer was sustained. Nor do we find it necessary in disposing of the case to consider at all the anti-trust statutes of the State. Leaving out of view entirely the applicability of the anti-trust statutes, we think the controlling and decisive question in the case is—did the averments of the answer, which must be treated as true, state the defense of an unlawful and unreasonable restraint of trade upon which Brent was entitled to introduce evidence and have a decision on the merits? And, in considering this feature of the case, we will treat the contract as if made directly between Brent and Gay and his associates, because under the averments of the answer Prunty in making the purchase was acting for and on behalf of Gay and Company.

It will be observed from the contract entered into between Gay and his associates that the Central Kentucky Blue Grass Seed Company was formed by them for the purpose of buying and selling Blue Grass seed only, and that the members were forbidden to sell stripped seed, which is the seed in the rough as it is bought from the farmers except to a member of the company, unless by special permit; and, that no sales were to be made in the name of the company, the members making the sales in their individual names and assuming individually the risk of loss. It will further be noticed that under the contract, the members were to share equally the profits and losses resulting from the business, and that an account of the amount of business done by each firm was to be kept; and that before any seed was shipped it was to be formally turned over to the company, and that in the event any seed was carried over at the end of the year there was to be an equalization among the members. The contract also provided that weekly statements were to be made, showing the business done by the firm, and that if any member contracted to clean seed for an outside party, that such seed should be divided equally, unless by other agreement; and also that all the old stock held by the members was to be turned into the company, and that the holding of it should be controlled by the company, and that the sale of old stock should bear a specified proportion to the new stock handled by the company. The contract also fixed the price to be paid for cleaning seed, and the price to be paid for stripped seed or seed in the rough as it comes

from the farm; and contemplated that the organization of the company should be kept secret from the trade as well as from the farmers. It will also be noticed that the answer in substance charged that the partnership or agreement entered into between Gay and his associates had for its purpose the creation of a trust and monopoly to control the Blue Grass seed market of the country, and to fix and regulate the price at which the seed should be sold; and that in pursuance of this purpose and to carry it into effect the purchase of the car load of seed from Brent was one of many purchases undertaken in execution of the plan to control and monopolize the market and fix and regulate the price of the seed.

In Merchants Ice & Cold Storage Co. v. Rohrman, 138, Ky., 530, the court had under consideration a case in many material respects similar to this. In that case the Merchants Ice & Cold Storage Company endeavored to create a trust for the purpose of controlling the sale of manufactured ice in the city of Louisville, and in pursuance of its plan it purchased the National Ice & Cold Storage Company from Rohrman and the other stockholders under a contract in which Rohrman and the others agreed that they would not for a period of ten years thereafter engage in the business of manufacturing or selling ice in Jefferson County, Kentucky. After this, Rohrman engaged in the business of manufacturing and selling ice, and the Merchants Ice & Cold Storage Company brought an action against him to enjoin him from violating the contract he had entered into. In holding that this contract was an unreasonable and illegal restraint of trade, and against public policy, and therefore non-enforcible, and in answer to the argument that the purchase of the National Ice & Cold Storage Company involved only the sale and purchase of one manufacturing plant to another and therefore it should not be treated as an illegal arrangement or as an unreasonable or unlawful agreement in restraint of trade, the court said. "But the validity of this particular contract cannot be determined by looking at it alone. It must be considered in connection with the others of which it was and is a part, and when so considered in connection with the circumstances under which it was entered into and the conditions that gave rise to its execution, we find that it was

only one of a number of like contracts secured about the same time by the Merchants' Refrigerating Company in futherance of the purpose to obtain control of the ice market and effectually destroy substantial competition. In short, we think it is plain that the purpose in the minds of the parties to this transaction was to purchase the National Ice & Cold Storage Company and Rohrman's interest therein as a link in the chain that would, finally bind all the consumers of ice in Louisville to the wheels of a single concern, thereby creating a condition that would enable the purchaser to control the market and stifle if not suppress competition. * * * If a contract is made that suppresses competition, and controls the market, and that contract is entered into between those who have theretofore engaged in competition in the market sought to be controlled, it is a contract in restraint of trade. It may be more. It may amount to a trust or conspiracy or a monopoly, but it is nevertheless a contract in restraint of trade. To restrain trade is the essential feature of the contract—the reason why it was made. * * * If trade that is in competition could not be restrained, the promoters would not go into the scheme; and when such a contract is made, whatever form it may assume, or by whatever name it may be called, and although it may be reached under the law of monopolies, trusts, and conspiracies, it will be declared void as being in unreasonable restraint of trade.''

In Continental Wall Paper Co. v. Louis Voight & Sons Co., 212 U. S., 227, 53 L. ed., 486, it appears from the opinion that the Continental Wall Paper Company was a corporation organized to control the wall paper trade of the country, and that as a part of this plan it entered into a contract, which was not entirely voluntary on the part of the other contracting parties, with a number of dealers in wall paper throughout the country, including Louis Voight & Sons Co., by which these dealers' bound themselves to buy all the wall paper needed in their business from the Continental Wall Paper Co. or the constituent establishments owned and controlled by it, and to sell the paper so bought at a price fixed by the selling corporation. After this contract had been entered into, Louis Voight & Sons Co., purchased a large quantity of paper from the Continental Wall Paper Co., and in a suit by it to recover the amount of the purchase

price, Louis Voight & Sons Co., set up the illegal char-
acter of the wall paper company, averring that its crea-
tion and manner of conducting business was a viola-
tion of the anti-trust laws of the United States, as well
as unlawful under the common law doctrine of restraint
of trade.    In holding that the answer of Louis Voight
& Sons Company presented a defense upon which they
were entitled to a hearing and trial, the court in the
course of the opinion quoted with approval from McMul-
len v. Hoffman, 174, U. S., 639, 43 L. ed., 1117, the fol-
lowing:

"The court refuses to enforce such a contract, and
it permits defendant to set up its illegality, not out of
any regard for the defendant who sets it up, but only on
account of the public interest.    It has been often stated
in similar cases that the defense is a very dishonest one,
and it lies ill in the mouth of the defendant to allege it,
and it is only allowed for public consideration and in
order the better to secure the public against dishonest
transactions.    To refuse to grant either party to an ille-
gal contract judicial aid for the enforcement of his al-
leged rights under it tends strongly towards reducing
the number of such transactions to a minimum.    The
more plainly parties understand that when they enter
into contracts of this nature they place themselves out-
side the protection of the law, so far as that protection
consists in aiding them to enforce such contracts, the
less inclined will they be to enter into them.    In that
way the public secures the benefit of a rigid adherence
to the law."

It is true that in the Rohrman case and in the wall
paper company case, the contract that the court declined
to enforce was entered into between parties who had full
notice of the character and effect of the contract at the
time of its execution, and who therefore might be said
to have been parties to the illegal transaction and the
question before the court was the validity or enforcibil-
ity of a contract between parties to the illegal arrange-
ment; while in this case Brent was not in any manner
a party to or connected with the agreement formed by
Gay and his associates.    But this difference in the facts
of the cases does not affect the principle involved.    The
executory contract sought to be enforced should not be
treated as being merely collateral to the unlawful agree-
ment of Gay and Company.    The purchase of seed from

Brent was a necessary step in the perfection of the scheme to control the market and suppress competition and just as essential to its full accomplishment as was the contract in the Rohrman case, by which Rohrman agreed not to enter into business in competition with the monopoly, and as was the contract in the wall paper case, where Louis Voight & Sons Company refused to pay for articles they had purchased from the wall paper company. Whether or not the courts in an effort to obstruct as much as possible the growth and power of combinations in restraint of trade should decline to enforce an executed contract between the combination and a party to whom it had sold its product, is a question not before us in this case. It was, however, ruled by the United States Supreme Court in Connolly v. Union Sewer Pipe Co., 184 U. S., 540, 46 L. ed., 679, that the illegality at common law of a combination formed to restrain trade did not deny the combination the right to recover the purchase price of goods sold in the course of its business. But. however this may be, we feel very sure of our ground in declaring that the courts should not lend their aid to assist an illegal combination in restraint of trade in the enforcement of executory contracts that would enable it to more successfully accomplish its unlawful objects. Bishop v. American Preservers Company, 157 Ill., 284, 48 Am. St. Rep., 317. Nor do we think that in ruling that the scheme of Gay and Company was an agreement in restraint of trade, we have unduly extended the scope of the principle upon which the doctrine rests. It is true that by the common law contracts treated as being in restraint of trade were limited to contracts having for their purpose the purchase of some trade or business, as a part of which the seller agreed not to engage in the trade or business he had disposed of. But, in dealing with conditions brought about by modern business methods, it has been found necessary for the public good to extend the common law prohibition against contracts in restraint of trade to states of case involving more than the mere purchasing and selling of a trade or business, so as to give the courts for the good of the public authority to prevent as much as possible combinations and arrangements having for their purpose the creation of a monopoly, the control of prices, and the suppression of com-

petition. Addison Pipe & Steel Co. v. United States, 175 U. S., 211, 44 L. ed., 136.

The restraint of trade may be accomplished in more ways than one. Every business scheme that has for its purpose the control of the market and the fixing of prices, necessarily tends to restrain trade and suppress competition in the article sought to be controlled. But when the doctrine was first recognized conditions were such that the public good only required that it be applied to contracts of sale and between the parties to the contract. It is, however, manifest that if this wholesome principle of the common law should be confined to the narrow limits that were sufficient in its origin, it would be wholly inadequate to correct the evils that modern trade conditions have produced. And so, taking for a foundation the principle that illegal and unreasonable restraint of trade is obnoxious to the spirit of the law, the range of this principle will be extended to meet the requirements of today and to embrace every condition in which an unlawful attempt is made to restrain trade and control the market and suppress competition by whatever means these ends are sought to be accomplished.

Looking now to the case we have, we find that under the admitted averments of the answer Gay and his associates conceived the plan of controlling the Blue Grass seed of the country, and of fixing and regulating the price of this useful article, and, in pursuance of this plan, which had as one of its chief purposes the restraint of trade and the suppression of competition, in this article by competitors, they sought to secretly and quietly secure from Brent and other dealers in Blue Grass seed a sufficient quantity of the seed to enable them to effectually carry out their scheme to restrain and monopolize. That the purchase of the seed from Brent was only a part of the arrangement, it being the purpose to obtain in like manner the possesion of seed owned by other independent dealers; and, that Brent would not have sold the seed to Gay and his associates if he had known of the arrangement between them, but in ignorance of the scheme devised by Gay and his associates he was induced to sell his seed to Prunty, who was acting for them without the knowledge of Brent.

Under the admitted facts on the record, to enforce this contract would be to depart from principles that

have been expressly recognized by this court in the Rohrman case as well as in Artic Ice Co. v. Franklin Electric & Ice Co., 145 Ky., 32; Clemmons v. Meadows, 123 Ky., 179; Anderson v. Jett, 89 Ky., 375, and other cases.

In our opinion the answer and amended answer pleading that the contract was in restraint of trade presented a good defense.

Wherefore the judgment is reversed with directions to proceed in conformity with this opinion. Judge Winn not sitting.