## Indian Refining Company v. Kellar, et al.

(Decided June 13, 1924.)

### Appeal from Warren Circuit Court.

1. Carriers—Oil Company Held Not Liable on Theory of Unlawful Discrimination as Carrier Between Sellers of Oil.—An oil refining company, even though conceded to be a common carrier by reason of control of pipe lines, was not liable to seller of oil under contract for difference in price paid for such oil and oil of other sellers not under contract, on theory of discrimination by a carrier in interstate commerce contrary to federal acts concerning freight rates.

2. Monopolies—Contract for Purchase and Sale of Oil Held Not Void.—A contract of sale and· purchase of oil. held not void as a monopolistic contract, though purchaser was the only buyer of crude oil on ground at time contract was made, under Ky. Stats. 1922, sections 3915-3921.

3. Monopolies—One has Right to Purchase at Whatever Price Seller May Agree, Regardless of Amount Paid to Others.—Unless brought about by a forbidden combination, one has a right to purchase a commodity, such as oil, regardless of what he may be compelled to pay others for same or similar articles.

R. H. LEE, CHANEY & DIXON, RICHMOND WEED and McGAUGHEY, TOHILL & McGAUGHEY for appellant.

THOMAS, THOMAS & LOGAN, RODES & HARLIN and GAINES & GARDNER for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

The appellant and defendant below, Indian Refining Company, is a corporation created under the laws of the state of Maine with the chartered power to purchase and deal in crude oil and to refine it.   Incidentally, it is given power to manufacture all by-products growing out of the process of refining, and to transport the crude oil which it refines from the wells or localities in which the purchase is made to its located refinery or refineries, one of which (and so far as this record shows its only one) is located at Lawrenceville, Illinois.

Prior to February 25, 1921, it had purchased *some* crude oil in what is known in this record as the western oil fields in Kentucky and particularly in Allen and Warren counties, and it had constructed some facilities to enable it to gather and centralize the oil it purchased to a shipping point on the line of the nearest carrier, which, as to the oil involved in this case, was Memphis junction in Warren county, Kentucky, and on the line of the Louisville & Nashville Railroad Company. Up to the date mentioned but a comparatively small quantity of oil obtained in either of those counties had been purchased by the company. On that date and for some time prior thereto the Tex-Ken Oil Corporation was the holder of a lease on the farm of appellees and plaintiffs below, C. A. and Bertha Kellar, entitling it to explore thereon for oil and with the right to produce it as long as it was found thereon in paying quantities, and under the terms of the lease plaintiffs were to receive a royalty of one-eighth of the oil produced. The lessee had drilled a num-

ber of wells on the farm and had constructed tanks thereon into which the oil from the wells was pumped and stored. The tanks were filled at that time and there were not sufficient purchasers in that field to market all the oil produced by the various lessees and other producers therein. When there *was* a market found the price of the product was low, and defendant on the day specified entered into a contract with the lessee of plaintiff to purchase not only the oil it then had on hand but all that it produced within five years thereafter, which oil was to be taken at short designated intervals and to be paid for at "the published market price of the Somerset oil as published from time to time in the Oil City Derrick, a newspaper published in Oil City, Pennsylvania, less thirty-two (32) cents per barrel during the term of this contract," and which, as stated further on in the contract, included the royalty oil going to the lessor, and there was a provision that the latter should sign a division order to that effect. Defendant furnished the lessee a prepared division order, as provided for, and it, duly executed by plaintiffs and witnessesed by two witnesses, was subsequently returned to defendant. From that time forward it took all the oil produced on plaintiffs' farm at the times and under the terms agreed upon in its contract and paid therefor seven-eights to the lessees, Tex-Ken Oil Corporation, and one-eighth to plaintiffs, which latter interest, at the time of filing this action in the Warren circuit court on January 20, 1923, amounted to 5,-948.15 barrels and at prices agreed upon to $8,886.84. The bi-monthly payments made to plaintiffs for their oil due them under their royalty rights were made and collected by them without complaint. They filed this equity action on the day above named to recover thirty-two cents per barrel for all the royalty oil that defendant had received under the contract and to cancel it upon the grounds (1), that it was void, and (2), that the division order signed by plaintiffs did not in terms specify that it was to continue for the same time (five years) as the contract made with the lessee.

Defendant's demurrer to the petition was overruled and it answered denying both contentions made by plaintiffs. A considerable amount of evidence was taken and upon final submission the court rendered a judgment in favor of plaintiffs against defendant for thirty-two cents per barrel for all of the crude oil received by it from plaintiffs as a part of their royalty interest, but it made

no ruling therein as to what should be the rights of the parties in the future, *i. e.*, whether defendant would be compelled throughout the five years to take plaintiffs' oil at the agreed price in the contract without the thirty-two cents per barrel reduction, or whether the contract should at once cease and terminate because of its adjudged invalidity. It would rather appear from the court's opinion filed in the case, as well as from the terms of the judgment itself, that it was the court's idea that defendant would be compelled to carry out the contract without making the reduction agreed upon, but whether that was the intention is not clearly indicated. Conceiving that the judgment, under the evidence heard, was unauthorized, defendant prosecutes this appeal.

1. It was alleged in the petition that shortly after the contract here involved was entered into, which was only one of many of the same tenor and effect, competitive purchasers of oil appeared in the western Kentucky producing fields, including Warren county, and began to pay for crude oil the published prices in the Oil City Derrick for Somerset oil without the reduction of thirty-two cents or any other amount per barrel, and that to meet those prices defendant also began to pay the same price to producers with whom it had no such contracts; and that it thereby discriminated against those with whom it held such contracts, including the one involved here. In support of the alleged discrimination it was also averred in the petition that defendant was a common carrier of oil and that the thirty-two cents per barrel reduction, under the contract, was an unlawful discrimination against the producers who had so contracted in favor of those who had made no such contracts with defendant, and that the contract violated the federal statutes against discrimination in freight rates by interstate common carriers known as the "act to regulate commerce," passed in 1906, as amended in 1916; and the case of Prairie Oil & Gas Co. v. United States, 204 Fed. Rep. 798, and the same case on appeal to the Supreme Court and reported in 234 U. S. 458, under the style of the "Pipe Line Cases," are relied on. Those cases dealt with acknowledged common carriers of oil by means of pipe lines, and before any of the principles announced by the court in the opinions could be made applicable here, it would first be necessary to show that the defendant was (a), a common carrier, and if so (b), that the contract involved related to its business as such, and affected

rights between shipper and carrier. We find nothing in the record sustaining requisite (a), unless the mere fact of procuring other carriers to transport its crude oil from the place of purchase to its refinery could be said to constitute it a common carrier. That contention, however, is not even attempted by counsel for plaintiffs; but they insist, as we understand them, that in some manner, not clear to us, defendant became a common carrier by constructing its gathering lines running from the producing wells to the central shipping point within the field from which oil was purchased and gathered, and that it also became such common carrier because of its construction of a pipe line from Owensboro, Ky., to Lawrenceville, Ill., a distance of about seventy miles, some time in 1922 and after the contract involved was entered into, by another corporation organized for the purpose under the name of Indian Pipe Line Company. That company was organized as a common carrier and some of its stockholders, as well as officers, were also stockholders and officers in the defendant company, and for that reason it is claimed that the Indian Pipe Line Company is but another name for the Indian Refining Company, and that at least since the construction of the pipe line from Owensboro, Ky., to Lawrenceville, Ill., defendant became a common carrier and is now engaged in that business when it employs the Indian Pipe Line Company to transport its oil through that pipe line. We do not deem it necessary to determine the question of fact, i. e., whether defendant was at the time of entering into the contract for the purchase of the oil in question a common carrier, such as is contemplated by the interstate commerce act, or whether it became such because of the construction of the pipe line from Owensboro, Ky., to Lawrenceville, Ill., by the Indian Pipe Line Company (though we are inclined to the opinion that it did not), for the reason the contract, though it should be conceded the defendant was a common carrier at the time it was made, had no connection with shipments or remotely approached the creation of rights of a shipper as against a common carrier. The contract was purely and simply one for the purchase of crude oil by the alleged common carrier, and it became vested with the title thereto as soon as the filled tank was turned over to it. It could then ship or otherwise handle its purchased product in any manner it pleased and do with it whatever it desired. Neither plaintiffs nor others similarly situated were shippers of oil, nor were they

then or at any time thereafter demanding the right to ship their oil over any lines or means of transportation owned, provided for, or employed for the purpose by defendant in the shipment of its own oil. The case might be likened unto that of a railroad common carrier purchasing coal for its engines, in which case it surely could not and would not be contended that as between the seller of the coal and the common carrier purchaser, the relationship of carrier and shipper was created. The proposition is so convincingly true to our minds that we deem it an unnecessary consumption of both time and space in its further elaboration. It is, therefore, our conclusion that no cause of action is shown as growing out of any common carrier characteristics of the defendant.

But it is next insisted under this ground that the contract is void, to use the language found in brief, ''Because the admitted facts show an absolute monopoly at the time of the execution of the contract in question, and that the contract was executed as a result of said monopoly, and that appellees' lessee was forced to execute the same and appellees forced to sign the division order, or suffer a great and irreparable loss;'' but the argument advanced in support thereof is by no means convincing. At the time the contract was entered into, the act of May 20, 1890, forbidding the formation of certain kinds of pools, trusts and conspiracies, having for their purpose certain designated objects, and which is chapter 101 of Carroll's 1922 edition of the Kentucky Statutes, as perhaps modified by chapter 50, page 211, Acts 1920, was the only statutory law in existence in this Commonwealth forbidding monopolistic contracts. Chapter 17, Acts of 1916, on that subject was declared invalid in the case of Commonwealth v. Hatfield Coal Co., 186 Ky. 411, and the other statutes referred to were repealed by chapter 71, Acts of 1922, page 217. But, whatever were the acts that composed the statutory law on the subject at the time the contract was entered into, none of the provisions of any of them apply to the facts of this case, nor did they bring the acts and conduct of defendant in purchasing the oil within the scope of either of them. Each of them was directed to unlawful combinations, arrangements, *agreements,* and conspiracies entered into for the purpose of bringing about and creating the monopolistic conditions, and had no reference to such conditions not so brought about.

If, therefore, defendant at the time it entered into the contract did so under monopolistic conditions to

which it in no manner contributed, the transactions were not such as denounced by either of the statutes referred to or by any common law provision against unlawful monopolies in restraint of trade, etc. The condition, which it is claimed produced in favor of defendant a monopoly, was the fact (but which defendant denies) that it was the only purchaser of crude oil on the ground or within the field, including Warren county, at the time the contract was entered into. In other words, it is contended that at that time there were no competing purchasers of crude oil with defendant and because of that fact it enjoyed a monopoly as the sole buyer at that time. We are aware of no law, statutory or otherwise, stamping as invalid transactions entered into under such conditions, nor have we been cited to any so holding. Indeed, if the principle contended for was correct communities could not be accommodated wherein there was but a single physician, painter, shoemaker, merchant or miller, because, forsooth, a contract with them for services in line with their respective professions or callings would be monopolistic and void. The very elements of a forbidden monopoly are wanting in this case, and that being true this ground for declaring the contract void must necessarly be rejected.

2. In disposing of this ground but little need be said. While the division order was not by any of its *express* terms extended so as to include the entire period of the contract, yet we are satisfied that it was so understood and acted upon by the parties. It contained all the terms of the sale found in the contract, except as to its duration, and for more than two years plaintiffs settled with defendants according to the stipulated prices and other terms of the contract, and there can not be the slightest doubt but that they were informed of and knew at the time when they executed that division order that it was for the purpose of covering the entire period of the contract.

Nor is there any merit in the contention that defendant was guilty of discrimination because it paid higher prices to others for similar *spot* oil and whereby it incurred no obligation to take future oil. It paid every one coming within either class of sellers exactly the same price for exactly the same quality of oil; to those with whom it had entered into an obligation for a fixed period it paid the contract price; and to each of those from whom it purchased oil and to whom it was not obligated for

any period, it paid the same price. If, however, it were different, we would not then be prepared to say that plaintiffs' rights would be anywise different, for, unless brought about by a forbidden combination, one has the right to purchase a commodity at whatever price the seller may agree upon, regardless of what he may be compelled to pay others for the same or a similar article. Some of the many cases sustaining the principle herein set forth are: Commonwealth v. Hatfield Coal Co., 193 Ky. 229; Love v. Kozy Theater Co., idem 336; Brent v. Gay, 149 Ky. 615; Gay v. Brent, 166 Ky. 833, and Connelly v. Union Sewer Pipe Co., 184 U. S. 540.

A more extended discussion of the questions involved might more fully elucidate the unsoundness of plaintiffs' contentions, but it could not render them any less certainly so, and for the reasons stated the judgment is reversed with directions to dismiss the petition.