## Johnson et al. v. Stumbo et al.

Oct. 25, 1938.

As Modified on Rehearing Jan. 24, 1939.

CHESTER A. BACH, Special Judge.

304

ANDREW E. AUXIER, E. D. STEPHENSON and CLAUDE P. STEPHENS for appellants.

J. W. HOWARD, EDWARD L. ALLEN, JOE P. TACKETT and JAMES BURNETTE for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Reversing.

The Beaver Valley Hospital was established in Martin, Floyd County, in 1918, by Dr. W. L. Stumbo, and his brother, Dr. Ed Stumbo. After the latter's death it was owned and operated by the former. Its services to the men of the numerous mining and other industries in the community have been very extensive. It likewise has taken care of many pauper patients for which Floyd County was responsible. The services were rendered under contracts with the industries for the hospitalization of their employees and families. The contracts seem to have been made at the instance of the men and negotiated with the labor unions. Deductions were made from their wages and paid to the hospital. The county patients were cared for under a contract with the fiscal court, which paid a considerable sum annually. A few days before Dr. Stumbo qualified as county judge in January, 1930, he transferred title to the hospital property to his wife, Mrs. Annie Stumbo. But he continued the active management and operation. In January, 1935, Dr. Stumbo and his wife sold the property to six doctors, who, as partners, were conducting the Pikeville Clinic. This case arises out of that sale. It involves the validity of a contract restricting competition by Dr. Stumbo, its breach, the justification thereof and remedy therefor. These primary questions present several subsidiary ones. The record is very large and the briefs exhaustive. The demands for some degree of brevity confine us to but little more than a statement of the points and our conclusions on the evidence.

The deed to the property, including equipment, executed on January 30, 1935, is in the usual form. It re-

cites the consideration to be $40,000, of which $15,000 was cash and $500 payable monthly, as evidenced by fifty (50) notes. The grantees were R. S. Johnson, S. B. Casebolt, R. W. Raynor, M. D. Flannery, A. G. Osborne and Paul Gronerud. There was contemporaneously executed by all the parties a contract which recites that, "Whereas, the first parties (the Stumbos) have this day sold and conveyed," the hospital property for the consideration stated:

"It is mutually agreed that first parties will not own or operate a hospital by purchase or lease, or otherwise, in Floyd County, Kentucky, for a period of 10 years from date hereof, and in consideration of the purchase of said hospital property by second parties as aforesaid, and the said agreement of first parties of first part not to own or operate a hospital as aforesaid for said period of time is declared to be a moving consideration in the purchase of said hospital property described in said deed aforesaid, the parties of the first part, jointly and severally, covenant and agree with the parties of the second part, their successors or assigns, in ownership of said hospital property, that they or either of them will not own or operate a hospital by purchase, lease or otherwise, directly or indirectly, in Floyd County, Kentucky, for said period of 10 years from date hereof.

"It is mutually agreed between the parties hereto that Dr. W. L. Stumbo shall have the right to bring his patients to the Beaver Valley Hospital, Inc., the corporation organized to take over said hospital property for medical or surgical treatment, under the usual custom, the patients to pay the usual fees and compensation charged other patients in said hospital. All contracts with coal and gas companies and the U. M. W. of A. are to be assigned to the Beaver Valley Hospital, Inc. Also rights to Floyd Fiscal Court order."

Dr. Stumbo and his wife executed an instrument assigning and transferring to the "Beaver Valley Hospital, Incorporated" twenty contracts with the industries, and "the rights and benefits of the Floyd County orders of the fiscal court for county patients" made to "Annie Stumbo and the Beaver Valley Hospital." The assignees or transferrees were "To have and to hold

and (sic) all the benefits therefrom with our good will and assistance.''

The purchasers of the hospital entered into possession and began its operation. They expended a considerable sum in renovating and improving the buildings and modernizing the equipment.

A little more than a year afterward, Dr. Stumbo erected and began the operation of a hospital in Knott County about 300 yards from the Floyd County line. He named it the ''Stumbo Memorial Hospital.'' Soon thereafter, the purchasers of the Beaver Valley Hospital, excepting Dr. Casebolt, whose interest had been acquired by Dr. J. E. Allen, instituted this suit against the Stumbos alleging a violation of the contract they had made not to own or operate a hospital in Floyd county for a period of ten years. The petition charged the defendants had violated the terms and the spirit of their contract in many particulars. A declaration of rights and injunctive remedies were asked. At the end of three months, the defendants having apparently exhausted every conceivable dilatory tactic and built up the record to 225 pages of pleadings and orders, the hearing of evidence was begun by Honorable Chester Bach, as special judge. It consumed thirty-six days.

The answer denied essential allegations of the petition and affirmatively pleaded that the restrictive covenant was void because against public policy in that it undertook to suppress competition and to give plaintiffs a monopoly; also that the consideration for that promise was plaintiff's agreement that Dr. Stumbo should have the right to bring his patients to the Beaver Valley Hospital. Concerning that consideration or provision of the contract it was alleged that the capacity of the hospital was inadequate to meet the needs of the community served; that plaintiffs had failed to increase the facilities of the hospital, and that within 30 days of the making of the contract the purchasers had breached their contract allowing him to take his patients there. This breach was plead in justification of the erection of the Stumbo Memorial Hospital, which, it is alleged, was necessary in order for Dr. Stumbo to care for his patients. The alleged breach of the contract by plaintiffs had damaged the defendants in the sum of $100,000, for which they prayed judgment over against the plaintiffs. But this counter-claim for damages was withdrawn by the defendants when directed

by the court to make it more definite and specific. These are but the more important provisions of the pleadings. Other allegations, with the exception of estoppel and the invalidity of the assignment of the contracts, seem to have eventually become of no materiality.

A few days after the taking of evidence was begun, the defendants filed an amended answer withdrawing inconsistent allegations and setting up the invalidity of the contract sued on upon the ground which has become their principal house of refuge, namely, the transaction had been closed by the execution of a contract of sale and purchase of the property on January 26, 1935, which was four days before the contract containing the restrictive covenant was executed. That first contract did not contain such an agreement. The pleading of no consideration, however, was really no consideration except the promise as to accepting Dr. Stumbo's patients, and plaintiffs' breach thereof.

One year, lacking a week, after the suit was filed, Judge Bach rendered judgment denying the plaintiffs any relief except to enjoin the defendants for a period of ten years from January 30, 1935, from admitting into their hospital any patients "covered by the several contracts set out in the assignment of February 1, 1935," being twenty in number. The judgment dismisses the counterclaim, although it had already been dismissed. It recites that the court had not deemed it necessary to pass upon and it should not be construed as passing upon the alleged breach of contract with plaintiffs or defendants. Since half the contracts referred to had been terminated and the others were terminable by either party at will, the result is that the plaintiffs received but little relief.

The question of the validity of contracts in restraint of trade—which relates also to professional competitive occupations—has been the subject of consideration by the courts from a very early period. The law has undergone distinctive stages of transition or development. In later years the rule of reason has been read into the law, so that restraint is recognized as legal if reasonable and limited as to territory or duration. 6. R. C. L. 786. The test of reasonableness is whether the restraint, considering the particular situation and circumstances, is such only as to afford a fair protection to the legitimate interests of the party in favor of whom it is given and not so extensive as to

interfere with the interests of the public. Primarily, such a contract, by which one deprives himself of his labor, skill or talent, or his liberty of engaging in similar business, must be ancillary to the main purpose of a lawful contract, usually the sale of a business or profession, and necessary to protect the covenantee in the enjoyment of the legitimate fruits of the contract. The vendor who thus curbs his rights has received an equivalent for his partial abstention in the increased price paid him for it; that is, he has received compensation for that intangible property right known as good will. No distinction is made in agreements of professional men and tradesmen. 6 R. C. L. 790, 793, 804. If, on the other hand, one for a consideration independent of the sale of his business or profession, agrees not to serve the public, with the view of giving a competitor a monopoly, particularly in the conduct of a quasi public institution, the contract is not enforceable. Thus in Clemons v. Meadows, 123 Ky. 178, 94 S. W. 13, 29 Ky. Law Rep. 619, 6 L. R. A., N. S., 847, 124 Am. St. Rep. 339, this court held illegal, because against public policy, a contract whereby the owner and operator of one of two principal hotels in a city of about 5,000 population agreed to close his hotel and keep it closed three years for the payment of $100 a month.

The defendants sought to tie on to this rule of invalidity. By their amended pleading and evidence they insisted that the sale of the hospital was consummated by the contract of January 26th, and that the transaction had been completed then save only for the execution of the formal deed. Therefore, they argue, their restrictive covenant was not only independent of the sale of the hospital but was without consideration as well, since the entire sum of $40,000 was to be paid for the property. They insist that this covenant formed no part of the consideration inducing or supporting the purchase and was not ancillary to the main transaction. It is submitted that being bound already to pay this sum, the recital in the contract of January 30th that the covenant not to own or operate a hospital in Floyd County was a moving consideration for the payment of the purchase money is invalid and of no effect for any purpose since the promise to do what one is already bound to do cannot constitute a valid consideration for a further promise or obligation. To destroy the corner stone of the plaintiffs' cause of action in this

manner, it was necessary that the contract of January 30th should be reformed by deleting the phrase "this day" which referred to the sale and conveyance, and "the moving consideration in the purchase of said hospital property" was the promise not to own and operate a hospital in Floyd County within ten years. On the other hand, the plaintiffs sought to reform the contract of January 26th, to have it contain this restrictive covenant.

The contract of January 26th is clearly one of sale and purchase and contains no reference to either of the collateral or subsidiary obligations concerning the care of Dr. Stumbo's patients or his refraining from operating the hospital. But the contract seems to show on its face that there were other agreements to be reached between the parties. It contains this paragraph: "It is further agreed that final consummation of said trade is to be effected by mutual co-operation of the parties hereto as soon as title to the property can be abstracted."

The evidence of Dr. Stumbo, his wife and counsel is to the effect that nothing had been said about any restriction of competition. However, we think the preponderance of evidence, consisting not only of testimony of several witnesses but many potent circumstances, coupled with the foregoing paragraph, shows that the restrictive agreement was indeed a primary consideration for the transaction. The contract of January 26th was executed on behalf of the purchasers by Dr. Casebolt and Dr. Johnson "as trustees for the Pikeville clinic." They and their partners in that practice deny authority in these two men to bind their fellows beyond agreeing upon the purchase price. It does not seem necessary to pass upon that issue. Nor does it seem material to the decision of the questions involved that the contract of January 26th might have been enforced by a suit for specific performance or some other remedy. There is no rule of law which prevents the mutual annulment of a written contract, though it relates to a land transaction, or that hinders a supplement, even by parol. This is not antagonistic to the fundamental and salutary rule that a written contract may not be altered or modified by parol evidence. Phipps v. Frances, 267 Ky. 203, 101 S. W. (2d) 924. There is no conflict in the two writings. The first one not only left open but anticipated a supplement or

subsequent agreement. The latter, executed contemporaneously with the deed, expresses a meeting of the minds on the points in controversy at the time of the consummation of the entire transaction. "The power to modify or rescind a pre-existing agreement is co-extensive with the power to initiate it; either is an incident of contractual capacity." Vinaird v. Bodkins' Adm'x, 254 Ky. 841, 72 S. W. (2d) 707, 711; Reid v. Reid, 230 Ky. 835, 20 S. W. (2d) 1015. In short, our conclusion is that the parties entered into the contract January 30th as ancillary to the purchase and sale of the hospital and as a consideration therefor, so that the deed and the contract are to be regarded as one transaction supported by the same consideration. Breeding v. Tandy, 148 Ky. 345, 146 S. W. 742; Gunther Grocery Company v. Koll, 153 Ky. 446, 155 S. W. 1145; Lane v. Allen, 201 Ky. 643, 258 S. W. 85.

Contracts in restraint of trade or of competition are not looked upon with favor by the law. Though a contract of the character and extent of that now before us is not prohibited, the law will not lend aid in its enforcement unless it is, as we have already in part indicated and as counsel for appellees say, "(a) Merely ancillary to the main purpose of a lawful contract, (b) necessary to protect the covenantee in the enjoyment of the legitimate fruits of the contract, or to protect him from the dangers of an unjust use of those fruits by the other party, (c) for a just and honest purpose, (d) reasonable as between the parties, (e) not prejudicial or specially injurious to the public interests, (f) or does not tend to suppress competition nor create a monopoly." See Williston on Contracts, Secs. 1636, 1637; Restatement of the Law of Contracts, Sec. 516.

Reaching beyond the several other arguments by which it is sought to relieve appellees of their commitment, counsel submit that this contract, relating, as it does, to a hospital, a quasi-public institution, must be deemed invalid because prejudicial or specially injurious to the public interests and as tending to suppress competition and create a monopoly. Concerning such a general proposition in relation to a public service, it was written in Anderson v. Jett, 89 Ky. 375, 12 S. W. 670, 672, 11 Ky. Law Rep. 570, 6 L. R. A. 390:

"Rivalry is the life of trade. The thrift and welfare of the people depend upon it. Monopoly is opposed to it, all along the line. The accumulation of

wealth out of the sweat of honest toilers by means of combinations is opposed to competing trade and enterprise. That public policy that encourages fair dealing, honest thrift, and enterprise among all the citizens of the commonwealth, and is opposed to monopolies and combinations, because unfriendly to such thrift and enterprise, declares all combinations whose object is to destroy or impede free competition between the several lines of business engaged in, utterly void. The combination or agreement, whether or not in the particular instance it has the desired effect, is void. The vice is in the combination or agreement. The practical evil effect of the combination only demonstrates its character; but, if its object is to prevent or impede free and fair competition in trade, and may in fact have that tendency, it is void, as being against public policy."

However, the case in which that was said is entirely different. The contract was an agreement by the owners of two rival steamboats, operating on the Kentucky River, that in order to prevent reduction of shipping charges the net profits of each boat should be shared in a certain proportion and if the owners of either boat should sell with a view of going out of business, those so selling should not enter the trade again within one year. The quoted statement of the court is good and its application to the facts of that case is well. We have other cases clearly coming within the rule that if one should pay a competitor to promise to go out of business or cease to compete, the agreement is invalid. See Clemons v. Meadows, 123 Ky. 178, 94 S. W. 13, 29 Ky. Law Rep. 619, 6 L. R. A., N. S., 847, 124 Am. St. Rep. 339; Artic Ice Company v. Franklin Co., 145 Ky. 32, 139 S. W. 1080; Brent v. Gay, 149 Ky. 615, 149 S. W. 915, 41 L. R. A., N. S., 1034; Gay v. Brent, 166 Ky. 833, 179 S. W. 1051; Love v. Kozy Theater Company, 193 Ky. 336, 236 S. W. 243, 26 A. L. R. 364; Morris v. Gilliam, 213 Ky. 763, 281 S. W. 1026. While it may be said that a hospital (like the hotel in Clemons v. Meadows, supra) is a quasi-public enterprise, this agreement is part of the consideration for the sale of the business and not, as in that case, an independent or disassociated contract to suppress competition or create a monopoly. It was held in Nickell v. Johnson, 162 Ky. 520, 172 S. W. 938, that an agreement by a seller of a half interest in a stage coach line not to operate a com-

peting business or carry passengers between the termini of the original line was valid and enforceable, not being in restraint of trade. A public stage line has from the beginning of travel been recognized as a business peculiarly of a public nature, strictly controlled by governmental authorities. The same conclusion was reached as to undertakers and embalmers, which may be regarded as of quasi public character. Torian v. Fuqua, 175 Ky. 428, 194 S. W. 359, L. R. A. 1917F, 251; Elkins v. Barclay, 243 Ky. 144, 47 S. W. (2d) 945. In line with the general weight of authority, we have upheld contracts of this nature restraining a purchaser of property or a business from engaging in competitive business of several different kinds. Linneman & Moore v. Allison & Yates, 142 Ky. 309, 134 S. W. 134; Barrone v. Moseley Brothers, 144 Ky. 698, 139 S. W. 869; Breeding v. Tandy, 148 Ky. 345, 146 S. W. 742; Gutzeit v. Strader, 158 Ky. 131, 164 S. W. 318; Torian v. Fuqua, 175 Ky. 428, 194 S. W. 359, L. R. A. 1917F, 251; Boone v. Burnham & Dallas, 179 Ky. 91, 200 S. W. 315; Keen v. Ross, 186 Ky. 256, 216 S. W. 605; Thomas W. Briggs Company v. Mason, 217 Ky. 269, 289 S. W. 295, 52 A. L. R. 1344; Durham v. Lewis, 231 Ky. 601, 21 S. W. (2d) 1004; Davey Tree Expert Company v. Ackelbein, 233 Ky. 115, 25 S. W. (2d) 62; Elkins v. Barclay, 243 Ky. 144, 47 S. W. (2d) 945; Mattingly Co. v. Mattingly, 96 Ky. 430, 27 S. W. 985, 17 Ky. Law Rep 1, rehearing denied, 31 S. W. 279; Skaggs v. Simpson, 110 S. W. 251, 33 Ky. Law Rep. 410. Excepting Hill v. Gudgell, 9 Ky. Law Rep. 436 (a decision of the Superior Court) holding valid a contract whereby a physician, for a valuable consideration, agreed to quit the practice of medicine in a specified vicinity, it appears we have not had in this state any case involving a contract restraining the practice of a profession. But contracts between professional men, such as physicians and surgeons, not to practice in competition with another pursuing the same calling, have been frequently enforced in other jurisdictions where such contracts conformed to the rule of being only partial in their restraint, founded upon a valuable consideration and reasonable in their operation, no distinction being made between their contracts and those of tradesmen. 6 R. C. L. 804; Annotations 58 A. L. R. 157. The doctrine, therefore, has been too long and too firmly settled to be shaken now by holding that a private hospital is of such a public nature that a contract of its owners that they will not set up another in competition

of that which they are selling is against public policy. The restrictive contract is valid and subsistent.

We come now to consider its interpretation in relation to the extent of territory embraced. The contract stipulates that Dr. Stumbo and his wife shall not own or operate a hospital by purchase or lease, or otherwise, directly or indirectly, in Floyd County for a period of ten years. The Beaver Valley Hospital is situated in the town of Martin on State Highway No. 80, at or near the confluence of the Right Fork and the Left Fork of Beaver Creek, along both of which streams the Chesapeake & Ohio Railway runs. The new Stumbo Memorial Hospital is only 300 yards out of Floyd County over in Knott County and 10 or 12 miles from the Beaver Valley Hospital. It is on the same highway and the railroad up the Right Fork of Beaver Creek. It is closer to several of the larger mines in Floyd County than is the old hospital. It is in the northeast edge of Knott County which is sparsely settled and where there are few, if any, mines or other industries. It is some distance from Hindman, the county seat. Therefore, it is manifest that the location was chosen for the deliberate purpose of securing the industrial hospital business of Floyd County. Dr. Stumbo testified that he built the hospital in order to care for the men of a number of mines who had no contract with the Beaver Valley Hospital, and as well those whose contracts had been or were to be cancelled. He did not feel legally bound by his contract because the other parties had broken their agreement by their mistreatment of himself.

The evidence discloses a very aggravated invasion of the territory which had been served by the older institution. Of the 1,008 patients entering the Stumbo Hospital up to the time Dr. Stumbo testified 828 of them were from Floyd County. All the time Dr. Stumbo was county judge of Floyd County and a very influential man. The solicitation of business and inducement of cancellation of hospital contracts was not all. The nurses and other employees were taken away from the Beaver Valley Hospital. In some instances, the conduct approached, if it did not embrace, the tortious wrong of "Interference with Contract Relations." See 15 R. C. L. 54. Cf. Brooks v. Patterson, 234 Ky. 757, 29 S. W. (2d) 26. It is true that the letter of the contract in respect of location of the hospital was strictly ob-

served. But as forcefully said in Whitney v. Wyman, 101 U. S. 392, 396, 25 L. Ed. 1050:

"As the meaning of the law-maker is the law, so the meaning of the contracting parties is the agreement. Words are merely the symbols they employ to manifest their purpose that it may be carried into execution. * * * The intent developed is alone material, and when that is ascertained it is conclusive."

Obviously, geography was not important. The important thing was the protection against an unjust competitive encroachment upon the community being served and the business being received. That community and that business were in Floyd County. Furthermore, the instrument, assigning the rights of the vendors in the hospitalization contracts with the coal mining companies, concludes: "To have and to hold all the benefits therefrom, with our good will and assistance." Good will has been defined as the probability that the old customers will resort to the old place. Potter & Co. v. Wait, 15 Ky. Law Rep. 60. Cf. J. G. Mattingly Company v. Mattingly, 96 Ky. 430, 27 S. W. 985, 17 Ky. Law Rep. 1; Id., 31 S. W. 279, 17 Ky. Law Rep. 1. Unquestionably, this includes not only the probabilities attaching to a location but those attaching to an established business wherever it may be situated. And the sale of good will whether in express terms, as here, or implied from the sale of the business, carries with it certain implied obligations on the part of the seller. There is at least an implied promise that the seller will not solicit the trade of old customers nor do any act that will interfere with the vendees' use and enjoyment. Williston on Contracts, Section 1640. This is particularly so of a professional business, Annotation, 82 A. L. R. 1034. While this specific transfer of good will was a part only of the assignment of the hospitalization contracts, breach of those assignments constituted a considerable part of the violation of the covenant of restraint upon competition.

It is the general rule of the courts in upholding covenants of this character not only to prohibit the covenantor who establishes a place of competitive business in close proximity to the prescribed territory from soliciting business there, but to prohibit the doing of any business within the territory irrespective of whether it is obtained by solicitation. 6 R. C. L. 1018; Foxworth-Galbraith Lumber Company v. Turner, 121 Tex.

177, 46 S. W. (2d) 663, 87 A. L. R. 323; Annotations, 82 A. L. R. 1035. We have applied that rule in several cases.

In Skaggs v. Simpson, 110 S. W. 251, 33 Ky. Law Rep. 410, Simpson, a dealer in monuments or tombstones in Murray, sold his business to a competitor, Skaggs, and agreed that he would "not open up a marble shop in the city of Murray in three years." He went 150 feet beyond the city limits and opened up the same business. In holding that Skaggs was entitled to an injunction restraining Simpson from conducting his establishment, the court said that it was "not open to doubt" that Simpson violated the spirit and intention of the writing when he went outside the city limits and set up a business. We refused to concur in his insistence that his rights should be adjudged by the very words of the contract and that the other party must be left without redress because he had not violated the letter of the writing. The rule that a contract should be read and construed in the light of the intention of the parties at the time it is entered into, if it can be done without violence to the writing, was applied. The court said:

"Considering this contract from this standpoint, it is manifest that it was the intention of both parties to it, and an essential part of the consideration for the purchase, that Simpson should not engage in business in Murray or its vicinity, or in territory where he would come directly into competition with Skaggs for the term of three years. This does not mean that Simpson may not at other places establish himself in business, but only that he must not do so in the territory in which it may be presumed he would come into direct opposition with Skaggs, or in the territory in which he had been doing the business that he sold. We, therefore, conclude that Skaggs was entitled to an injunction restraining Simpson from conducting his establishment."

In Elkins v. Barclay, 243 Ky. 144, 47 S. W. (2d) 945, Elkins sold his undertaking and embalming business in Bardwell, Carlisle County, to a competitor in that city. He agreed that he would not directly or indirectly engage in that business in Carlisle County so long as the purchaser, Barclay, was so engaged. About a year later Elkins established the same business in Barlow, in the adjoining County of Ballard, about 15

miles distant from Bardwell. It does not appear that he solicited business in Carlisle County but he made sales of funeral supplies there and came into the county and rendered the customary burial services. A judgment enjoining him from so doing was affirmed.

.Other cases involving similar situation and conditions and giving force to contracts beyond their strict letter are Gutzeit v. Strader, 158 Ky. 131, 164 S. W. 318; Kochenrath v. Christman, 180 Ky. 799, 203 S. W. 738. The action of the defendants in taking and accepting the business from Floyd County was clearly a violation of their contract.

The defendants sought in this suit to justify their action in so violating their covenant upon the ground that plaintiffs had breached that part of the contract which gave Dr. Stumbo the right to have his patients cared for at the Beaver Valley Hospital. The breach of a contract by one party may have different results and create different rights and remedies in the adversary party according to the conditions and circumstances. In some cases the one not in default may treat the breach as a discharge, refuse to perform further, and use such breach as a defense. We are not so sure that the defendants had the legal right to ignore or refuse to perform their executory covenant not to enter into competition in the stipulated territory—that is, to rescind the contract, ex parte, without notice—even if it be regarded as proven that the purchasers first breached their executory promise. See Sharp v. White, 24 Ky. 106, 1 J. J. Marsh 106; Natural Rock Asphalt Corporation v. Carter, 221 Ky. 131, 297 S. W. 1114; Beattie v. Friddle, 229 Ky. 361, 17 S. W. (2d) 246; 6 R. C. L. 926; 12 Am. Jur. ''Contracts,'' Section 440. Unquestionably, if the purchasers broke their agreement, the other parties to the contract could have maintained an action for damages or suit for specific performance. However, they elected to treat the alleged default as a discharge. Accepting the appellees' view that the two contractual obligations are so related and dependent that the rule applies that the party first guilty of a breach of an entire and unseverable contract cannot complain if the other party thereafter refuses to perform, we look to the evidence.

Though about eighty witnesses were introduced to prove it, we are not convinced that the purchasers first violated the contract. It would seem that if they had

done so, and the defendants believed they had, Dr. and Mrs. Stumbo would have erected their new hospital in Floyd County and not have gone to Knott County. If they felt at the time that the action of the purchasers was sufficient legal justification, undoubtedly they would have put their institution near their home and within their own county. This significant fact put upon the defendants a heavy burden to establish justification retroactively. As a general proposition, "The party who seeks to rescind a contract because of the other's default must show that he had done all that he was required to do in order to entitle himself to a performance of it by the other party." 6 R. C. L. 926; 12 Am. Jur. "Contracts," Section 438.

There is evidence that some of Dr. Stumbo's patients were turned away or at least given to understand that they could not be treated at the hospital by him, and that the nurses and employees were directed not to co-operate with him or carry out his instructions and orders until they were approved by Dr. Casebolt. It is claimed the atmosphere of the place and the conditions under which Dr. Stumbo was compelled to practice were intolerable. The defendants' claim is, particularly, that the conduct of Dr. Casebolt, the partner who three months after the purchase became the manager of the hospital and the members of the staff, were endeavoring to and did "freeze" Dr. Stumbo out. There is testimony which, if taken at its face value, tends to prove gross malpractice and mistreatment of Dr. Stumbo's patients, and unprofessional and unfair treatment of the doctor personally. On the other hand, all of such instances are vigorously contradicted or explained. The plaintiffs and Dr. Casebolt, and the members of the staff (with the exception of two or three who had gone over to the Stumbo Hospital), deny that Dr. Stumbo was ever refused the use of the facilities or that he or his patients were treated other than in a considerate manner. There is a maze of contradictions. The question naturally arises, what motive could the owners of the hospital have had for antagonizing and mistreating this doctor, with such extensive practice and a man of such great influence and power in the county? It is quite significant, we think, that within a few weeks after the sale Dr. Stumbo wanted to lease a floor of the hospital for the care of the employees of two coal companies whose contracts with the Beaver Valley Hospi-

tal had been transferred by him to its new owners. His offer was refused. We have the impression that after this he set about to make the situation unpleasant and that his attitude and conduct was such as to irritate and interfere with the operation of the hospital as the new owners sought to operate it. Such conditions necessarily created friction. Undoubtedly, the acts of the hospital authorities and attachés were often misconstrued, and their mistreatment magnified as the breach widened and the differences became more serious. It is significant also that Dr. Stumbo never said anything to the other purchasers about being mistreated by Dr. Casebolt and the staff. It appears that after a year or so, because of personal conduct of and unfortunate habits acquired by Dr. Casebolt, he and his partners had trouble which resulted in his selling his interest to Dr. Allen, and there was some bad feeling on Dr. Casebolt's part toward his former associates. His testimony in this case, however, is favorable to their side and unfavorable to Dr. Stumbo, who had suggested that if he would help him he would not include him in the suit, and had otherwise sought to influence him in his behalf. In short, our conclusion is that Dr. Stumbo did not prove that he acted in good faith. We believe he precipitated and was the primary cause of the trouble which resulted in what he later deemed to be the plaintiffs' breach of contract. About the first of March, 1936, Dr. Stumbo sent his attorney to the plaintiffs with an offer to re-purchase it and to advise them if it was not accepted he would "put in another hospital." When the offer was refused, the defendants began the construction of their institution in competition.

The appellees question the validity of their assignment of the industrial hospitalization contracts to the "Beaver Valley Hospital, Incorporated, the corporation organized to take over said hospital property for medical or surgical treatment under the usual custom." It is true the majority of the decisions are to the effect that a corporation may not engage in the practice of medicine or surgery through licensed employees. Annotation, 103 A. L. R. 1240; Cf. Hodgen v. Commonwealth, 142 Ky. 722, 135 S. W. 311. Certainly, a corporation may not engage in the practice of medicine or surgery in the sense that an individual physician or surgeon practices. But we know of no reason why a corporation may not conduct a hospital and have its officers and em-

ployees perform the usual services of a hospital. These contracts related to hospital services and not strictly medical or surgical. The explanation of the designation is that the purchasers of the Beaver Valley Hospital contemplated forming a corporation to which the property should be transferred. The vendors well knew it had not been formed. The partners later changed their minds and no corporation was ever created. All the parties well understood the situation. The six men were the real parties in interest and the assignments were made for their benefit. To hold them illegal on this account would be to drop the substance for the shadow.

Equally without merit is the argument that as these contracts called for the personal services of Dr. Stumbo, therefore, they were not assignable. There was, of course, no legal authority to sell or bind the patients. The purpose and effect was to transfer the rights of the hospital in the contracts under which the owners were receiving considerable compensation through the collective bargaining of the several groups of employees and their employers. If the patients were complaining we would have another case. Certainly, any possible invalidity upon any ground of assignment could not license the covenantors to own or operate a hospital in Floyd County contrary to their voluntarily assumed obligations.

The contention that the plaintiffs are estopped by their conduct from enjoining the defendants from operating their hospital cannot be sustained. They knew that the building was being erected in Knott County and that the defendants purposed to operate it. But they were not required to anticipate the defendants would violate the contract by which they had bound themselves not to enter into competition in Floyd County. When that competition began and the encroachment upon the rights which the plaintiffs had acquired commenced, they seasonably brought their suit to enjoin it.

Necessarily, the plaintiffs make no claim that Dr. Stumbo may not practice his profession in Floyd County or send his patients out of the county. Their only contention is that neither he nor his wife may own or lease or operate, directly or indirectly, any hospital to which those Floyd County patients may be taken. The contract is not that the employees of the industries who had these contracts for hospital care should not terminate them or go where they might choose. It is that Dr.

Stumbo or his wife shall not make or maintain a place for them to go. The restraint is upon them and not upon their patients.

We are of opinion the plaintiffs showed their right ∪o the relief asked and that judgment should be entered declaring that under the contracts neither of the defendants, Dr. W. L. Stumbo or Mrs. Annie Stumbo, may, during the period of ten years from January 30, 1935, own or lease or operate, by themselves or through any other person, directly or indirectly, a hospital of the character and nature of that which they sold to the plaintiffs, at any place in Floyd County. An injunction should issue enjoining the defendants, and each of them, from receiving for medical or surgical care or treatment any person who resides or lives in Floyd County, in any hospital rendering the same or similar services which they, directly, or indirectly, own, lease or operate.

Since no mention is made in appellees' brief of their cross appeal, it is deemed abandoned.

The judgment is reversed with directions to enter judgment consistent with the opinion.

Whole Court sitting, except Ratliff, J.