896 A.2d 408

**Marina MASLOW**

v.

**Apparo VANGURI.**

**No. 564 Sept. Term, 2005.**

Court of Special Appeals of Maryland.

April 11, 2006.

300

Harvey K. Maizels, Baltimore, for Appellant.

Barbara L. Ayres, Towson, for Appellee.

Panel: HOLLANDER, KENNEY and BARBERA, JJ.

HOLLANDER, Judge.

In this appeal, we must determine whether a party's breach of a "High–Low" settlement agreement was material, so as to permit rescission of the agreement. Marina Maslow, appellant, sued Apparo Vanguri, M.D., appellee, for medical malpractice. During the course of a jury trial in the Circuit Court for Baltimore County, the parties entered into what is colloquially referred to as a High–Low settlement agreement (the "Agreement"), the terms of which were placed on the record and reduced to writing.[1] Pursuant to the Agreement, both parties agreed not to appeal the jury's verdict. Nevertheless, after the jury returned a verdict in favor of Dr. Vanguri, appellant appealed to this Court, which affirmed. *See Maslow v. Vanguri,* No. 821, September Term 2003, 159 Md.App. 745, 750 (filed October 27, 2004) (*"Maslow I"*). Accordingly, Dr. Vanguri refused to pay appellant the "low" of $250,000 due under the Agreement. The circuit court subsequently denied Ms. Maslow's "Motion to Enforce High/Low Settlement Agreement," leading to her second appeal to this Court.

Ms. Maslow presents the following questions:

---

1. Unless otherwise noted, we shall refer to the oral and written versions collectively as the "Agreement."

A. Did Marina Maslow's first appeal under the facts of this case justify a rescission of the High/Low Settlement Agreement, or did it instead require Dr. Vanguri to seek his remedy, if at all, in damages?

B. To the extent that Ms. Maslow's appeal required Dr. Vanguri to seek his remedy in damages, did he do everything reasonably necessary and prudent to mitigate his damages, or did he instead waive his right to even complain at all?

For the reasons set forth below, we shall affirm.

## FACTUAL AND PROCEDURAL SUMMARY

On December 20, 2000, appellant filed suit against Dr. Vanguri, alleging that he was negligent in performing a vagotomy and antrectomy[2] on September 25, 1997, and complaining that he failed to obtain her informed consent. Trial commenced on May 12, 2003 (Jakubowski, J., presiding). During the trial, on May 16, 2003, the parties entered into the Agreement that is at issue here.

The Agreement provided that, in the event appellee won (as he did) or the jury returned a verdict in appellant's favor for less than $250,000, appellee would nonetheless pay $250,000 to appellant. The parties also agreed that, in the event the verdict favored appellant and was in excess of $1,000,000, appellee's obligation would be capped at $1,000,000. And, if the jury returned a verdict in favor of appellant, in an amount between $250,000 and $1,000,000, the parties agreed that appellee would pay the precise amount within that range. In

---

**2.** A vagotomy and antrectomy is a surgical procedure intended to reduce the amount of acid in the stomach and thus reduce the frequency of ulcers. During this procedure, the nerves to the patient's stomach are cut and part of the stomach is removed. The stomach is then sewn back together and reconnected. If the stomach is reconnected to the duodenum (the upper portion of the small intestine), then the reconnection is termed a Billroth I. If the stomach is reconnected to the jejunum (a lower portion of the small intestine), then the reconnection is termed a Billroth II.

addition, and of import here, the parties agreed that neither side would take an appeal from the verdict.[3]

The parties placed the terms of the Agreement on the record. The following exchange is relevant:

[THE COURT]: Do you want to put on the record at this point what you put on the bench—

\* \* \*

[APPELLANT'S COUNSEL]: All right. The agreement is that the Plaintiff and the Defendant have entered into a high/low agreement whereby if there is a, if there's no finding of liability, the Defendant's carrier will continue to pay the sum of $250,000 into a Special Needs Trust benefitting Miss Maslow. The trustee will be named later. The trust will be established and approved by the Attorney General's Office. And, again, I'm not even sure—

[APPELLEE'S COUNSEL]: The, the high—

[APPELLANT'S COUNSEL]: The high of the figure—

[APPELLEE'S COUNSEL]:—is a million dollars.

[APPELLANT'S COUNSEL]:—is a million dollars.

[APPELLEE'S COUNSEL]: And—

[APPELLANT'S COUNSEL]: And if the Jury comes back anywhere in between, that is the figure.

[APPELLEE'S COUNSEL]: Yes. Yes. If they award $600,000 the award is $600,000; if they award a million two the award is a million dollars; if they award 200,000 they get $250.

[APPELLANT'S COUNSEL]: The payment will be—

[APPELLEE'S COUNSEL]: The payment will be 250.

---

**3.** We pause to point out that the Agreement was not reached prior to trial. Because the Agreement was reached on the fifth day of trial, the parties obviously had time to assess the way in which the trial was proceeding; they were apparently satisfied with the selection of the jury and with the way in which the trial judge was managing the case. We consider this salient in regard to the waiver of the right to appeal contained in the Agreement.

[APPELLANT'S COUNSEL]: We can't effect [sic] the judgment.

[APPELLEE'S COUNSEL]: Yeah, that's what I was trying to convey. We've agreed that there won't be any newspaper publications of Dr. Vanguri's name, *and there will be no appeal*—

[APPELLANT'S COUNSEL]: *No appeal.*

[APPELLEE'S COUNSEL]:—**by either side.**

[THE COURT]: Okay. All right. All right.

The one thing that we may not be able to control since this is going to go to verdict is I understand that you're not going to do anything to seek publicity but, I have to tell you, court reporters are around here all the time.

[APPELLEE'S COUNSEL]: I understand that.

[THE COURT]: And if there's a Plaintiff's verdict, or even if there's a defense verdict, it's typically put in the paper.

[APPELLANT'S COUNSEL]: Mm-hmm.

[APPELLEE'S COUNSEL]: What I had asked is that [appellant's counsel] agree not to, you know, himself to contact the media—

[THE COURT]: Okay.

[APPELLEE'S COUNSEL]:—and provide that.

[APPELLANT'S COUNSEL]: I, I have agreed.

[THE COURT]: And you have agreed to that?

[APPELLANT'S COUNSEL]: Yes.

[THE COURT]: Okay. But he's—there's certainly things they do right in/around this courtroom. I have to tell you I haven't seen one during this trial, but—

[APPELLEE'S COUNSEL]: And I can speak for Dr. Vanguri. He's in agreement with this high/low settlement agreement. Perhaps it would be good for Miss Maslow to be advised of her rights from the bench—

[THE COURT]: Okay.

[APPELLEE'S COUNSEL]:—just to have on the record.

[THE COURT]: Okay. All right. I, I'm happy to do that.

[APPELLANT'S COUNSEL]: Yes.

[THE COURT]: Miss Maslow, do you understand, has your attorney explained to you what the high/low agreement is?

[APPELLANT]: Yes, he has.

[THE COURT]: Okay. *So you understand that you do not have to accept a high/low; you can just wait and see what the jury does, not have any sort of agreement pre-verdict, and whatever the Jury does you would then be bound to[,] subject to any appellate rights. Do you understand that?*

[APPELLANT]: Yes. Actually, I'm doing a favor to Dr. Vanguri.

[APPELLANT'S COUNSEL]: Right.

[THE COURT]: Okay. But—

[APPELLANT]: (Nodding head yes.)

[THE COURT]:—you understand that if the Jury comes back with a Defense verdict—

[APPELLANT]: Yes.

[THE COURT]:—that you will still get $250,000?

[APPELLANT]: Yes.

[THE COURT]: Okay.

[APPELLANT]: And it's up, no.

[THE COURT]: If- -right. That'll be payable to a Special Needs Trust.

[APPELLANT]: Right. Yes.

[THE COURT]: If the Jury, however, comes back with $2 million, the most you can recover under this agreement is a million dollars.

[APPELLANT]: Yes.

[THE COURT]: You understand that—

[APPELLANT]: Yes.

[THE COURT]:—and you agree to that?

[APPELLANT]: Yes.

[THE COURT]: Okay. All right.

[APPELLANT'S COUNSEL]: And just so I can be sure, I've explained to you about the expenses of the litigation, how they must be deducted first; I've talked about the fees—

[APPELLANT]: Yeah.

[APPELLANT'S COUNSEL]:—with regard to my fees and the fees of the attorney who's setting up the Special Needs Trust.

[APPELLANT]: Yes.

[APPELLANT'S COUNSEL]: And you're in agreement that they have to be paid?

[APPELLANT]: Yes.

[THE COURT]: Okay.

[APPELLANT'S COUNSEL]: And, in addition to any liens that are outstanding. Okay. Okay.

[THE COURT]: At this point. Okay.

[APPELLEE'S COUNSEL]: We're good then.

[THE COURT]: Okay. So we'll resume a little after 1 o'clock. So that'll give the, you time to talk. . . .

(Emphasis added.)

In addition, appellant executed a two-page, handwritten document, dated May 16, 2003, specifying the terms of the Agreement. That document, the first page of which bears appellant's signature, states:

A high-low offer has been extended by the Defendant's insurance company. The high is $1,000,000.00 and the low is $250,000.00. If the pending case is won on the issue of liability, the most I can recover is $1,000,00.00[.] If the case is lost, the insurance company will still pay $250,000.00. *By agreeing to this high-low agreement, I understand that I am giving up any right of appeal* and any attempt to recover an award over $1,000,000.00 either from the Defendant directly or by way of an assigned bad faith case.

I am accepting this high-low arrangement based on representations by Louise Gonzales, Esq. who has been advising me through my attorney, Paul Weber. Ms. Gonzales has

indicated that the proceeds of a high low award can be protected by way of a special needs trust. I understand that no proceeds of the award under the high low agreement may be paid directly to me. A special needs trust must be established and approved by Maryland's Attorney General's Office. I understand that the approval process will take at least 6–8 weeks. I also understand that amounts of the medical may have to be determined by Medicare before such a special needs trust can be established. I understand that I will have to meet with Louise Gonzales, Esq. in order to establish this special needs trust and that her fees for these services have been estimated to be $3000.00.

I understand that the retainer agreement between me and Paul Weber remains in effect. I understand that all fees, litigation advanced expenses and established liens and letters of protection must be paid first out of any proceeds paid under the high low agreement.

I hereby agree to accept the high low agreement offered and I do so on my own free will and after consideration of the issue with my family.

(Emphasis added.)

On May 19, 2003, the jury returned a verdict in favor of appellee. It found that he did not breach the standard of care, appellant was contributorily negligent, and that appellee had obtained appellant's informed consent for the surgery.

From the adverse verdict, appellant, *pro se*, filed a motion for a new trial and a notice of appeal. In the motion for a new trial, appellant claimed that the jury should have been permitted to review witness depositions, as had been requested, and that the court erred in its instruction to the jury. On July 3, 2003, the circuit court denied the motion for new trial.

On October 21, 2003, appellant's trial attorney filed a notice of his withdrawal of appearance as well as a "Motion to Enforce High/Low Settlement Agreement of May 16, 2003." That motion stated:

Now comes Paul J. Weber and Hyatt, Peters & Weber, LLP, former counsel of the Plaintiff, Marina Maslow and moves this Honorable Court to enforce the high/low agreement entered between the parties on May 16, 2003 and for reasons states as follows:

1. During the course of trial in the above-captioned matter, the parties entered in to [sic] a high/low agreement which provided that if the pending case was won by the Plaintiff on the issue of liability, the most the Plaintiff would recover would be One Million Dollars ($1,000,000.00). If the case resulted in a Defendant's verdict, the insurance carrier on behalf of the Defendant would still pay the sum of Two Hundred Fifty Thousand Dollars ($250,000.00) to the Plaintiff. ***Both parties agreed that they were waiving the right of Appeal*** and that the Plaintiff was giving up any attempt to recover an award over one million dollars, either from the Defendant directly, or by way of an assigned bad faith case.

2. This Agreement was placed on the record during the course of the trial and, in addition, a document was executed by the Plaintiff, Marina Maslow, documenting the terms of the Agreement. A copy of this document executed by Mrs. Maslow on May 16, 2003 is attached hereto as Exhibit A.

3. On May 20, 2003, a judgment was entered in this matter on behalf of the Defendant.

4. Thereafter, unknown to counsel, the Plaintiff filed a pro-se motion with this Court and filed a Notice of Appeal. This Court denied the post-trial motion filed by the Plaintiff as it was not filed in a timely manner. The Appeal was dismissed by the Court of Special Appeals as no pre-hearing information report was filed by the Plaintiff.[4]

5. The Plaintiff, Marina Maslow, has now employed counsel in an attempt to overturn the dismissal of the Appeal by the Court of Special Appeals.

---

4. On December 30, 2003, this Court granted appellant's motion for reconsideration and reinstated her appeal.

6. As Plaintiff, Marina Maslow, has employed new counsel, this movant has withdrawn his Appearance on behalf of Ms. Maslow and now moves this Court to enforce the High/Low Settlement Agreement entered on May 16, 2003.

WHEREFORE, the movant, Paul J. Weber and Hyatt, Peters & Weber, LLP moves this Honorable Court for an Order enforcing the High/Low Agreement entered by the Plaintiff and the Defendant on May 16, 2003.

(Emphasis added.)

On November 3, 2003, appellant's new attorney filed a response to the motion filed by her former trial attorney. Through counsel, appellant argued that, under the Agreement, "nobody relinquished any appellate rights between the bracketed high/low sums but only above and below said risk limiting figures." Thus, appellant insisted that she relinquished her appellate rights only in regard to a verdict in excess of $1,000,000. Moreover, she argued: "The defendant's carrier should be directed to honor its promise as set forth in the high/low settlement agreement and to pay $250,000.00 as directed therein, notwithstanding plaintiff's exercise of her appellate rights within the bracketed high/low sums." The circuit court did not rule on the motion at that time.

Counsel for appellee wrote to counsel for appellant on March 11, 2004, stating:

I spoke with the claims representative for Princeton Insurance Company yesterday concerning the appeal of this matter which, as you know, violates the letter and the spirit of the High/Low Settlement Agreement we arrived at in the trial of this matter. As you know, Princeton had generously agreed to abide by its previous agreement to pay Mrs. Maslow the low amount of the agreement if she would drop the appeal. Now that the record in the appeal has been received and docketed and the parties are preparing to proceed with the appeal, that offer is withdrawn. As of the date of this letter, Princeton will consider that by her actions, Mrs. Maslow has unilaterally rescinded the agreement thus relieving Princeton of any obligation to make any payments to her.

On October 27, 2004, in an unreported opinion, this Court affirmed the verdict in favor of Dr. Vanguri. Regarding the motion to enforce the Agreement, the *Maslow I* Court explicitly noted in a footnote the terms of the Agreement, including the provision "not to appeal" and the pendency in the circuit court of Weber's motion to enforce the agreement. Moreover, the *Maslow I* Court stated: "The parties agree that the effect of that agreement is not before this court in this appeal."

In a letter dated February 24, 2005, appellant's counsel wrote to Judge Jakubowski, advising "that Ms. Maslow's appeal to the CSA was denied, and her Petition for Writ of Certiorari to the Court of Appeals was also just recently denied." Therefore, he asserted that "the appeal process is now concluded, and jurisdiction over the pending residual proceedings for enforcement of the parties' high-low settlement agreement is now properly before Your Honor." Appellant's lawyer also asked the court to "schedule a hearing to enforce the terms of the high-low settlement agreement, with the aim, at least from plaintiff's point of view, of requiring defendant's liability carrier to pay the sum of $250,000, as it had previously contracted to do."

On February 28, 2005, Judge Jakubowski replied:

I am in receipt of your letter of February 24, 2005. This Court is not in a position to schedule a hearing at this point in time since there is no pending pleading. If you wish to bring something formally to the attention of the Court you need to file the appropriate pleading and allow the Defendant time to respond. This Court will take no further action at this period in time.

On March 25, 2005, appellant filed "Plaintiff Marina Maslow's *Motion to Enforce High/Low Settlement Agreement of 5/16/03*," along with a request for a hearing. She averred:

1. The parties entered into a high/low settlement agreement on 5/16/03 while the case was still being tried before a jury.

2. The purpose of the agreement was to avoid catastrophic risk for each side, so that a jury award over

$1,000,000 would be capped at $1,000,000 to save the defendant from undue risk, while a jury award under $250,000 or for the defendant outright would bottom out at $250,000 to spare the plaintiff from undue risk.

3. *The settlement agreement also provided that the parties would not appeal the case,* among other things.

4. The jury returned a verdict for the defendant, and on 5/20/03 judgment was entered for the defendant.

5. The plaintiff filed a pro se appeal to the Court of Special Appeals, and thereafter hired the undersigned counsel to prepare a brief and give oral argument thereon. Her original attorney withdrew his appearance.

6. The Court of Special Appeals ultimately heard the case and affirmed the judgment of the Circuit Court as aforesaid. A petition for writ of certiorari was denied by the Court of Appeals.

7. Plaintiff has since made demand upon the defendant for payment of the sum of $250,000, payable to Marina Maslow and her attorney Paul Weber, but the defendant has refused or failed to pay same in material breach of the high/low settlement agreement of 5/16/03.

8. Defendant contends that the plaintiff forfeited her rights to the monetary benefits under the referenced high/low settlement agreement by reason of her appeal as aforesaid.

9. However, plaintiff contends that no forfeiture language was ever expressed in the high/low settlement agreement, and that she had never agreed not to pursue her appellate rights within the parameters of the high/low settlement agreement. In addition, the plaintiff contends as follows:

10. The high/low agreement was entered into solely for the purpose of eliminating catastrophic risks for *both* sides of this litigation, i.e., eliminating the risk of an excessive award against the defendant in exchange for eliminating the risk of a stingy award or no award that would be harmful to the plaintiff.

11. *Both* litigants have already benefited [sic] and continue to benefit from the object of said high/low agreement. Defendant was not, is not, and will never be, exposed to liability greater than $1,000,000 while plaintiff was not, is not, and will never be, exposed to recovery under $250,000. However, the action of the defendant has indeed infringed on the contractual benefit to the plaintiff.

12. Despite the fact that defendant did benefit and did continue to benefit from, the cap of $1,000,000 placed on any plaintiff's verdict, nevertheless, defendant seeks to strip away, repudiate or invalidate the reciprocal benefit legally owed to plaintiff, by refusing to pay her the agreed minimum sum of $250,000 that was expressed in the high/low agreement.

13. Despite the fact that the high/low agreement makes no express mention of any forfeiture of rights, defendant, nevertheless, unilaterally imposes a forfeiture of rights against the plaintiff, by refusing to issue and deliver that which defendant did expressly promise in the high/low agreement, to wit: $250,000. This, despite the fact that defendant has already benefitted from the risk-eliminating consideration of the $1,000,000 high-end cap.

14. Despite the fact that Mr. Paul J. Weber has a statutory interest in the $250,000 payment, in the form of an attorney's fee and lien secured under Section 10–501 of the Business Occupations and Professions Article of the Annotated Code of Maryland, nevertheless, defendant seeks to repudiate his interest, *and even his standing,* in this controversy. Mr. Weber was the disclosed statutory partner of Ms. Maslow, at least to the extent of his attorney's lien. He did disclose his expectation of attorney's fees at p. 91 of the transcript and continues to have standing in this matter.

15. Alternatively, the defendant had notice of Mr. Weber's *standing,* in the context of an expressed third party beneficiary to the contract, even while the defendant challenges the plaintiff's rights. His standing was made clear at p. 91 of the trial transcript.

* * *

17. Unilateral forfeitures, imposed by one side against the other, are always self-serving, due to unjust enrichment. In the absence of express contractual language authorizing the forfeiture in the manner now advanced by the defendant, it amounts to a repudiation of the high/low agreement without consent of the plaintiff.

18. At common law, parties to a contract may rescind it only by *mutual* consent. *Talbert v. Seek,* 210 Md. 34, 122 A.2d 469 (1956) (emphasis added). Obviously, the imposition of a forfeiture by defendant against plaintiff, in the instant case, is done without the plaintiff's consent.

19. Only where there had been a material breach in the agreement, causing irreparable injury or damages which are impossible or difficult to determine, only then can a party seek the aid of equity to obtain a rescission of the contract. *Vincent v. Palmer,* 179 Md. 365, 19 A.2d 183 (1941).

20. In the instant case, defendant suffered *no irreparable injury* by reason of plaintiff's pro se appeal. Defendant *was still* protected by the high-end cap of the high/low agreement.

21. With respect to the interpretation of the text of the agreement, there is absolutely nothing contained within the four corners of the text, where Ms. Maslow expressly waives her right to appeal from a low verdict up to $1,000,000, and nothing to indicate that any forfeitures may be imposed, even if she did so appeal.

22. Even if one did construe the agreement to prohibit *all* appeals, even then, the sole remedy available to the defendant is not forfeiture, but rather to ask the Court of Special Appeals to dismiss the appeal, a right which defendant did not exercise before the CSA.

23. Defendant should never be permitted to escape from its solemn, *expressed* promise to pay the low-end sum of $250,000.

On April 4, 2005, appellee filed "Defendant's Response to Plaintiff's Motion to Enforce High/Low Settlement Agree-

ment." He claimed that Ms. Maslow's arguments were "without merit," given the express language of the agreement. Dr. Vanguri argued that, "[i]n Maryland, where there has been a material breach of a contract, the non-breaching party has the right to rescind the agreement. This is black letter Maryland law. . . ." As appellee explained, the "parties to the agreement were seeking two things: limitation of their exposure risk and finality." In his view, Ms. Maslow's "adamant refusal to comply with the no appeal provision of her agreement" constituted a material breach of the Agreement, because "the agreement not to appeal goes to the heart of the high/low agreement." In support of his assertion that appellant's breach was material, Dr. Vanguri observed that it "caused substantial costs to the defendant, caused substantial delay which defeated the finality to which he was entitled, imposed additional stress" on him, and left him "open to the possibility that a new trial would be granted by [this Court]," which "potentially could have exposed him to the costs, stress, and financial exposure of a new trial."

Moreover, Dr. Vanguri insisted that "[t]here is no basis for the contention that the *sole* purpose of the high/low agreement was to eliminate 'catastrophic risks.'" Rather, said appellee, "[i]t clearly also was the intent of the parties to bind themselves to accept the outcome of the jury's determination and bring finality to the litigation." He added that he "would not have entered into such an agreement absent the provision that would give finality to the jury's determination."

Appellee also addressed the interest of appellant's first attorney in "the $250,000 payment in the form of an attorney's lien." He observed that "Mr. Weber's rights flow from a separate contract between himself as attorney and Mrs. Maslow as client." According to appellee, appellant's attorney was not a party to the Agreement, and appellee "has no direct or even indirect obligation to Mr. Weber. . . . His rights, if any, are against Mrs. Maslow." [5]

---

5. The parties do not address this issue further on appeal. We point out that appellant's trial attorney was not a party to the Agreement, nor did

Regarding appellant's contention that appellee's "sole remedy" was to seek dismissal of the appeal in *Maslow I*, appellee argued that his right to ask this Court to dismiss the appeal "would not have been an adequate remedy since it would not have avoided" the cost and delay of the appeal, or the stress caused by the appeal. Further, he characterized as "preposterous" the contention that he "should never be permitted to escape from [his] solemn, *expressed* promise to pay the low end sum of $250,000," given that appellant "obstinately refused to honor her part of this agreement," despite "ample opportunity to cure the breach." Appellee also requested a hearing on the motion.

The court scheduled a hearing for May 23, 2005. Nevertheless, without a hearing, it signed an order on April 12, 2005, denying appellant's motion to enforce the Agreement.[6] The court did not provide any explanation for its ruling.

We shall include additional facts in our discussion.

## DISCUSSION

### I.

 Settlement agreements are enforceable as independent contracts, subject to the same general rules of construction that apply to other contracts. *Langston v. Langston,* 366 Md. 490, 784 A.2d 1086 (2001); *Bruce v. Dyer,* 309 Md. 421, 433, 524 A.2d 777 (1987); *Goldberg v. Goldberg,* 290 Md. 204, 212, 428 A.2d 469 (1981); *Fultz v. Shaffer,* 111 Md.App. 278, 298, 681 A.2d 568 (1996). Moreover, public policy considerations favor the enforcement of settlement agreements. As

---

he attempt to intervene in the proceedings below to protect his interests. Moreover, appellant's trial attorney is not a party to this appeal. Although appellant's conduct may have affected trial counsel's recovery of legal fees, we express no opinion on the merits of any claim appellant's trial attorney may have had if he had been a party to the Agreement. Nor do we express any opinion as to counsel's rights to recover his legal fees from appellant.

6. Appellant *does not contend that,* under Maryland Rule 2–311(f), the court erred in failing to grant a hearing.

the Court of Appeals reiterated in *Clark v. Elza*, 286 Md. 208, 219, 406 A.2d 922 (1979), "courts should 'look with favor upon the compromise or settlement of law suits in the interest of efficient and economical administration of justice and the lessening of friction and acrimony.'" (quoting *Chertkof v. Harry C. Weiskittel Co.*, 251 Md. 544, 550, 248 A.2d 373 (1968), *cert. denied*, 394 U.S. 974, 89 S.Ct. 1467, 22 L.Ed.2d 754 (1969)); *see Chernick v. Chernick*, 327 Md. 470, 481–83, 610 A.2d 770 (1992) (for policy reasons, a party should not be able to renege on divorce consent judgment, in that the judgment reflects an agreement reached between the parties); *Bernstein v. Kapneck*, 290 Md. 452, 459, 430 A.2d 602 (1981) ("particularly in this era of burgeoning litigation, compromise and settlement of disputes outside of the court is to be encouraged and, thus, the settlement agreement evidencing accord and satisfaction is a jural act of exalted significance which without binding durability would render the compromise of disputes superfluous"); *Nationwide Mutual Ins. Co. v. Voland*, 103 Md.App. 225, 653 A.2d 484 (1995) (discussing public policy favoring settlement agreements); *David v. Warwell*, 86 Md.App. 306, 309–312, 586 A.2d 775 (1991) (same).

Because settlement agreements are governed by contract principles, the well-honed principles of contract construction are pertinent here. We turn to review them.

▅▅▅▅ "The interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law, subject to *de novo* review" by an appellate court. *Sy-Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 163, 829 A.2d 540 (2003); *see Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520 (2006); *Towson Univer. v. Conte*, 384 Md. 68, 78, 862 A.2d 941 (2004); *Lema v. Bank of Am., N.A.*, 375 Md. 625, 641, 826 A.2d 504 (2003). As a fundamental principle of contract construction, we seek to ascertain and effectuate the intention of the contracting parties. *Mercy Med. Center, Inc. v. United Healthcare of the Mid-Atlantic*, 149 Md.App. 336, 372, 815 A.2d 886, *cert. denied*, 374 Md. 583, 824 A.2d 59 (2003); *Phoenix Services*

*Limited Partnership v. Johns Hopkins Hosp.,* 167 Md.App. 327, 391, 892 A.2d 1185 (2006). In that process, we construe a contract "as a whole to determine the parties' intentions." *Sullins v. Allstate Ins. Co.,* 340 Md. 503, 508, 667 A.2d 617 (1995). Moreover, "the primary source for determining the intention of the parties is the language of the contract itself." *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship,* 109 Md.App. 217, 290–91, 674 A.2d 106 (1996), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997). Of equal import, we construe the words consistent with their usual and ordinary meaning, unless it is apparent that the parties ascribed a special or technical meaning to the words. *Id.; see MAMSI Life & Health Ins. Co. v. Callaway,* 375 Md. 261, 279, 825 A.2d 995 (2003); *Dutta v. State Farm Ins. Co.,* 363 Md. 540, 556, 769 A.2d 948 (2001); *Fister v. Allstate Life Ins. Co.,* 366 Md. 201, 210, 783 A.2d 194 (2001); *Cheney v. Bell Nat'l Life Ins. Co.,* 315 Md. 761, 766, 556 A.2d 1135 (1989).

■ To ascertain the parties' intent, courts in Maryland "have long adhered to the objective theory of contract interpretation, giving effect to the clear terms of agreements, regardless of the intent of the parties at the time of contract formation." *Myers,* at 198, 892 A.2d 520. *See Taylor v. NationsBank, N.A.,* 365 Md. 166, 178, 776 A.2d 645 (2001); *Auction & Estate Representatives, Inc. v. Ashton,* 354 Md. 333, 340, 731 A.2d 441 (1999); *Calomiris v. Woods,* 353 Md. 425, 435, 727 A.2d 358 (1999); *B & P Enterprises v. Overland Equip. Co.,* 133 Md.App. 583, 604, 758 A.2d 1026 (2000). Under this theory, when a contract is clear and unambiguous, "its construction is for the court to determine." *Wells v. Chevy Chase Bank, F.S.B.,* 363 Md. 232, 251, 768 A.2d 620 (2001).

■ A court will presume that the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract personally thought it meant or intended it to mean. *See Dennis v. Fire & Police Employees Ret. Sys.,* 390 Md. 639, 656–57, 890 A.2d 737 (2006); *Paine-Webber Inc. v. East,* 363 Md. 408, 414, 768 A.2d 1029 (2001).

Put another way, "the clear and unambiguous language of an agreement will not give away to what the parties thought that the agreement meant or intended it to mean." *Ashton*, 354 Md. at 341, 731 A.2d 441. Rather, "contractual intent is determined in accordance with what a reasonable person in the position of the parties at the time of the agreement would have intended by the language used." *Faulkner v. American Cas. Co. of Reading*, 85 Md.App. 595, 605–606, 584 A.2d 734, *cert. denied*, 323 Md. 1, 590 A.2d 158 (1991).

Notably, a contract is not ambiguous merely because the parties do not agree as to its meaning. *Fultz v. Shaffer*, 111 Md.App. 278, 299, 681 A.2d 568 (1996). Contractual language is considered ambiguous when the words are susceptible of more than one meaning to a reasonably prudent person. *Ashton*, 354 Md. at 340, 731 A.2d 441; *Calomiris*, 353 Md. at 436, 727 A.2d 358. To determine whether a contract is susceptible of more than one meaning, the court considers "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of the execution." *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388, 488 A.2d 486 (1985).

If a trial court finds that a contract is ambiguous, it may receive parol evidence to clarify the meaning. *See Beale v. Am. Nat'l. Lawyers Ins. Reciprocal*, 379 Md. 643, 660, 843 A.2d 78 (2004); *Bushey v. N. Assurance*, 362 Md. 626, 632, 766 A.2d 598 (2001). On the other hand, "evidence is ordinarily inadmissible to vary, alter, or contradict a contract that is complete and unambiguous." *Higgins v. Barnes*, 310 Md. 532, 537, 530 A.2d 724 (1987). And, of import here, it is not the province of the court to rewrite the terms of a contract so as to avoid hardship to a party, or because one party has become dissatisfied with its terms. *See Canaras v. Lift Truck Services, Inc.*, 272 Md. 337, 350, 322 A.2d 866 (1974); *Fultz*, 111 Md.App. at 298, 681 A.2d 568.

Applying the principles of contract construction outlined above, we are of the view that the Agreement constituted a clear and unambiguous contract. By its terms, it barred an

appeal of the jury's verdict, in exchange for the parties' commitment to pay or accept the high-low figures.

As noted, the jury returned a verdict entirely in favor of appellee. In the absence of the Agreement, appellee would not have had any financial obligation to appellant. Under the Agreement, however, Dr. Vanguri owed appellant $250,000, despite the jury's exoneration of him. Then, in breach of the Agreement, appellant pursued an appeal to this Court, and lost. The record indicates that, while the appeal was pending in *Maslow I*, appellee's insurance carrier agreed to abide by the Agreement, and offered to pay the $250,000 to appellant, conditioned on her abandonment of the appeal. Appellant declined to do so.

We are satisfied that appellant's conduct constituted a material breach of the Agreement, thereby entitling appellee to rescission. We explain.

## II.

Appellant does not dispute that, under the Agreement, no appeal was permitted from the jury's verdict. But, she contends that her breach was not material. Therefore, she argues that appellee was merely entitled to damages, not rescission. Moreover, she contends that rescission was not appropriate here, because the parties never expressly agreed to the remedy of rescission in the event of a breach.

Appellant proceeds to challenge the six cases cited below by appellee in support of his claim that, "[i]n Maryland, where there has been a material breach of a contract, the non-breaching party has the right to rescind the agreement." Appellant maintains that "to study them in detail is to discover that none of them actually supports the defendant's position, and all of them ironically favor the plaintiff's position." In addition, appellant discusses five other cases that she claims support her position "that rescission is only granted where the root consideration has been totally defeated, and, even then, only where the party seeking rescission has equitably offered to return the party to the status quo ante."

Appellee counters that "appellant's arguments about the Maryland case law cited by Dr. Vanguri in the court below miss the point." He asserts that the cases on which he relied "articulate in some form of words the proposition for which Defendant Dr. Vanguri cited them...." Further, he argues that "the other cases relied upon by the appellant, when interpreted correctly, provide no ground for overturning the trial court's ruling in favor of Dr. Vanguri."

## III.

Generally, a contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." Richard A. Lord, 1 Williston on Contracts § 1:1, at 2–3 (4th ed. 1990) ("Williston"). Accord Restatement (Second) Contracts § 1, at 5 (1981) ("Restatement"). "A contract is formed when an unrevoked offer made by one person is accepted by another." *Prince George's County v. Silverman,* 58 Md.App. 41, 57, 472 A.2d 104 (1984). Thus, mutual assent is an integral component of every contract. *See Lacy v. Arvin,* 140 Md.App. 412, 426, 780 A.2d 1180 (2001); *Kiley v. First National Bank of Maryland,* 102 Md.App. 317, 333–34, 649 A.2d 1145 (1994), *cert. denied,* 338 Md. 116, 656 A.2d 772, *cert. denied,* 516 U.S. 866, 116 S.Ct. 181, 133 L.Ed.2d 120 (1995). As we said in *Mitchell v. AARP,* 140 Md.App. 102, 116, 779 A.2d 1061 (2001), "An essential element with respect to the formation of a contract is ' "a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms." ' " (quoting *Safeway Stores, Inc. v. Altman,* 296 Md. 486, 489, 463 A.2d 829 (1983)) (other citations omitted).

A contract may be oral or written. Whether oral or written, a contract is not enforceable unless it expresses with definiteness and certainty the nature and extent of the parties' obligations and the essential terms of the agreement. *Mogavero v. Silverstein,* 142 Md.App. 259, 272, 790 A.2d 43

(2002), *cert. denied*, 369 Md. 181, 798 A.2d 553 (2002); *Canaras v. Lift Truck Services*, 272 Md. 337, 346, 322 A.2d 866 (1974); *Meyers v. Josselyn*, 212 Md. 266, 271, 129 A.2d 158 (1957); *Robinson v. Gardiner*, 196 Md. 213, 217, 76 A.2d 354 (1950). In other words, an agreement that omits an important term, or is otherwise too vague or indefinite with respect to essential terms, is not enforceable. *Mogavero*, 142 Md.App. at 272, 790 A.2d 43; *L & L Corp. v. Ammendale*, 248 Md. 380, 385, 236 A.2d 734 (1968); *Schloss v. Davis*, 213 Md. 119, 123, 131 A.2d 287 (1957) (a "contract may be so vague and uncertain as to price or amount as to be unenforceable.").

A contract may also be express or implied. "An express contract has been defined as 'an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing.'" *County Commissioners of Caroline County v. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747 A.2d 600 (2000) (quoting Black's Law Dictionary 323 (6th ed. 1990)).

In *Robinson*, 196 Md. at 217, 76 A.2d 354, the Court addressed the requirement of contractual certainty, stating:

> Of course, no action will lie upon a contract, whether written or verbal, where such a contract is vague or uncertain in its essential terms. The parties must express themselves in such terms that it can be ascertained to a reasonable degree of certainty what they mean. If the agreement be so vague and indefinite that it is not possible to collect from it the intention of the parties, it is void because neither the court nor jury could make a contract for the parties. Such a contract cannot be enforced in equity nor sued upon in law. For a contract to be legally enforceable, its language must not only be sufficiently definite to clearly inform the parties to it of what they may be called upon by its terms to do, but also must be sufficiently clear and definite in order that the courts, which may be required to enforce it, may be able to know the purpose and intention of the parties.

*See also* Joseph M. Perillo, 1 Corbin on Contracts § 4.1, at 525 (Rev. ed. 1993) ("Corbin") ("Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement have often been held to prevent the creation of an enforceable contract."); Restatement, § 33(1), at 92 ("Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain").

*Black's Law Dictionary* 1306–07 (6th ed. 1990) defines rescission as follows:

> **Rescission of Contract.** To avoid, or cancel a contract; particularly, nullifying a contract by the act of a party. *The right of rescission is the right to cancel (rescind) a contract upon the occurrence of certain kinds of default by the other contracting party.* To declare a contract void in its inception and to put an end to it as if it never were.... A "rescission" amounts to the unmaking of a contract, or an undoing of it from the beginning, and not merely a termination, and it may be effected by mutual agreement of parties, or by one of the parties declaring rescission of contract without consent of other if a legally sufficient ground therefor exists, or by applying to courts for a decree of rescission.... **It necessarily involves a repudiation of the contract and a refusal of the moving party to be further bound by it. Nonetheless, not every default in a contract will give rise to a right of rescission....**
>
> An action of an equitable nature in which a party seeks to be relieved of his obligations under a contract on the grounds of mutual mistake, fraud, impossibility, etc.

(Emphasis added.)

&#9646;&#9646;&#9646; In general, "[w]here ... there has been a material breach of a contract by one party, the other party has a right to rescind it." *Washington Homes, Inc. v. Interstate Land Development Co., Inc.,* 281 Md. 712, 728, 382 A.2d 555 (1978) (*quoting Plitt v. McMillan,* 244 Md. 450, 454, 223 A.2d 772

(1966)); *see also Traylor v. Grafton,* 273 Md. 649, 687, 332 A.2d 651 (1975) ("If one of the parties to a contract is guilty of a material breach the other may rescind."); *Foster–Porter Ent'prises v. De Mare,* 198 Md. 20, 36, 81 A.2d 325 (1951); *Vincent v. Palmer,* 179 Md. 365, 373–374, 19 A.2d 183 (1941); *Ady v. Jenkins,* 133 Md. 36, 38–39, 104 A. 178 (1918). However, rescission will not be granted "for casual or unimportant breaches, but only for a substantial breach tending to defeat the object of the contract." *Vincent,* 179 Md. at 373, 19 A.2d 183. Instead, rescission is permitted when "the act failed to be performed [goes] to the root of the contract or . . . render[s] the performance of the rest of the contract a thing different in substance from that which was contracted for." *Traylor,* 273 Md. at 687, 332 A.2d 651. Put another way, rescission is not available as a remedy when the breach is "slight." *Speed v. Bailey,* 153 Md. 655, 660, 139 A. 534 (1927). Consequently, "substantial performance under a contract permits the recovery of damages," rather than rescission. *Traylor,* 273 Md. at 687, 332 A.2d 651; *see also Senick v. Lucas,* 234 Md. 373, 377, 199 A.2d 375 (1964).

We disagree with appellant's contention "that the 'no appeals' provision [in the Agreement] was merely a subsidiary term, defining a prohibitory method or *means* for limiting the parties to the high or low end monetary limits of their agreement, but not itself the essential *end,* object, purpose or root of the agreement." Rather, we agree with appellee that the "no appeals" provision was a central element of the Agreement, and appellant's appeal of the jury's verdict constituted a material, "substantial breach tending to defeat the object of the contract." *Vincent,* 179 Md. at 373, 19 A.2d 183.

Indeed, appellant's conduct went "to the root of the contract." *Traylor,* 273 Md. at 687, 332 A.2d 651. In direct contravention of the terms of the Agreement, appellant took an appeal in which she clearly sought "a second bite at the apple," in order to recover more than the $250,000 due under the Agreement. As appellee posits, the parties sought "two closely related things: limitation of their exposure risks and

finality. The finality component is integral to the limitation of the risk. If the risk limitation is open to future alteration on appeal, then the risk still exists, and the limitation is meaningless."

Our analysis of the eleven cases discussed by appellant confirms our conclusion that, under the circumstances attendant here, the breach was not casual or insubstantial. To the contrary, it was integral to the contract.[7]

Appellant cites *Vincent v. Palmer, supra,* 179 Md. 365, 19 A.2d 183, for the premise that "Maryland courts are loath to rescind contractual obligations, if the nonperformance or breach is insubstantial." She reiterates that she "substantially performed by relinquishing her claim for damages over $1,000,000."

In *Vincent,* an employer, owing to degraded economic conditions, tried to escape his contractual obligations to pay ten percent of the business's net profits to an employee who had substantially performed his contractual obligations. 179 Md. at 368, 19 A.2d 183. The trial court ordered the employer to pay, and the Court of Appeals affirmed. In denying rescission based upon the employee's substantial performance, the Court said:

> *At common law the parties to a written contract have the right to rescind it by mutual consent, even though there is no provision in the contract permitting them to do so.* The parties to a contract may, either in writing or orally, release themselves from its obligations, so far as they remain executory, since the release of one party is sufficient consideration for the release of the other. *Denler & Denler Land Co. v. Eby,* 277 Mich. 360, 269 N.W. 203; *Aetna Life Insurance Co. v. Dodd,* 8 Cir., 103 F.2d 793; *Savage Arms Corporation v. United States,* 266 U.S. 217, 45 S.Ct. 30, 69 L.Ed. 253. However, when a contract has been entered into between competent parties, it is not within the power of

---

7. It is unnecessary to discuss each of the cases on which appellant relies.

either party to rescind it without an option to do so or without the consent of the other party, in the absence of fraud, duress, or undue influence, or unless either party is estopped by his own conduct, *or the equities of his position are otherwise such that he should not be permitted to enforce it. Loughran v. Ramsburg,* 174 Md. 181, 186, 197 A. 804, 807; *Pitcairn v. American Refrigerator Transit Co.,* 8 Cir., 101 F.2nd 929, *Chicago, B. & Q.R. Co. v. State of Nebraska,* 170 U.S. 57, 18 S.Ct. 513, 42 L.Ed. 948. A meeting of the minds is required not only to make a contract, but also to abrogate or modify it after it has been made. *Whiteside v. United States,* 93 U.S. 247, 12 Ct.Cl. 10, 23 L.Ed. 882; *Utley v. Donaldson,* 94 U.S. 29[, 4 Otto 29], 24 L.Ed. 54. Even repeated requests, however annoying, to terminate a contract, do not of themselves constitute ground for rescission. The ground on which the appellant sought to cancel the contract in this case was "the uncertainty of business." It is obvious that a party to a contract has no right to abrogate or modify it merely because he finds, in the light of changed conditions, that he made a bad deal. No court should undertake to redraft a contract merely because one of the parties has become dissatisfied with its provisions. *Cronacher v. Runge,* Mo.Sup., 98 S.W.2d 603.

*It has frequently been held that the mutual assent requisite to rescind a contract need not be express; it may be inferred from the conduct of the parties in the light of the surrounding circumstances. Dewey Portland Cement Co. v. Benton County Lumber Co.,* 187 Ark. 917, 63 S.W.2d 649; *Johnson v. Stumbo,* 277 Ky. 301, 126 S.W.2d 165; 6 *Williston on Contracts,* sec. 1826. If either party expresses an intention to abandon the performance of a contract, and the other party fails to object, there may be circumstances justifying the inference that the other party has assented thereto. Even circumstances of a negative character, such as the failure of both parties to take any steps looking to the enforcement of the contract, may sometimes amount to mutual assent to rescind it. But failure to object to a repudiation of a contract is not in itself a manifestation of

assent to its rescission. 2 *Restatement of Contracts,* sec. 406. Thus, even though it be assumed that Palmer received the alleged notice in 1933, it does not necessarily follow that the contract was rescinded. A mere notice cannot have the effect of rescinding a contract, unless the party giving the notice is entitled to rescind. *Brown v. Roberts,* 121 Cal. App. 654, 9 P.2d 517. To establish the rescission of a contract by implication, the acts relied upon must be un-equivocal and inconsistent with the existence of the contract, and the evidence must be clear and convincing. *Molyneux v. Twin Falls Canal Co.,* 54 Idaho 619, 35 P.2d 651, 94 A.L.R. 1264, 1273; 6 *Williston on Contracts,* sec. 1828. Therefore, conduct which is not necessarily inconsistent with the continuation of a contract will not be regarded as showing an implied agreement to discharge it, although such conduct might be consistent with an agreement to discharge it. *Duty v. Keith,* 191 Ark. 575, 87 S.W.2d 15, 17.

*Qualifying the rule that rescission requires the joint will of the parties, the general principle has been well estab-lished that if there has been well established breach of a contract, and the injury caused thereby is irreparable, or if the damages that might be awarded would be impossible or difficult to determine or inadequate, the injured party may invoke the aid of equity to obtain a rescission. Ady v. Jenkins, 133 Md. 36, 104 A. 178; Briggs v. Robinson, 82 Colo. 1, 256 P. 639, 52 A.L.R. 1172; 5 Williston on Con-tracts, sec. 1455. A Court, however, will not grant a rescission for casual or unimportant breaches, but only for a substantial breach tending to defeat the object of the contract. Speed v. Bailey, 153 Md. 655, 139 A. 534; Barry v. Frankini, 287 Mass. 196, 191 N.E. 651, 93 A.L.R. 1240.*

179 Md. at 371–373, 19 A.2d 183 (emphasis added).

To be sure, *Vincent* thoroughly states the law. But, as appellee observes, it "casts no light on the issue of whether the breach of the Appellant herein was material so as to justify rescission of the agreement." We look to other cases to shed light on that important issue.

Appellant relies on *Lazorcak v. Feuerstein,* 273 Md. 69, 327 A.2d 477 (1974), to support her position that her breach was not material. As we see it, *Lazorcak* does not advance her contention.

Mr. Lazorcak agreed to purchase a laundry from Mr. Feuerstein. He paid $3,500.00 down, with the remaining balance "payable in 60 equal consecutive monthly installments of $250.00. . . ." *Id.* at 70–71, 327 A.2d 477. Mr. Lazorcak's "initial efforts met with so much success that within only a few months he was aspiring to expand." *Id.* at 72, 327 A.2d 477. However, upon learning "that the dry cleaning machine, which was included in the purchase price and which was quite profitable, was being operated in the basement in violation of . . . the District of Columbia fire code," Lazorcak, through counsel, wrote to Feuerstein's attorney, seeking to rescind the agreement. *Id.* at 72, 327 A.2d 477. Lazorcak did not receive a response to the letter, and continued to conduct business as he had done in the past. Although the buyer made his next three payments, *id.* at 72–73, 327 A.2d 477, he failed to make the other payments that were due. As a result, Feuerstein filed suit, to which Lazorcak pled that there had been "a complete failure of consideration" and that he was "entitled to a rescission on the basis of 'Commercial frustration' and total failure of consideration." *Id.* at 73, 327 A.2d 477. Lazorcak also filed a countersuit alleging "breach of contract," "fraud," and "equitable relief by way of rescission." *Id.* The trial court entered judgment against Lazorcak for "the balance then due on the purchase price of the laundry business." *Id.*

The Court of Appeals "observe[d] that although the appellant utilizes the term 'failure of consideration'[ ] he . . . . is really seeking redress for Feuerstein's failure to perform as originally anticipated by the agreement." *Id.* at 74, 327 A.2d 477.[8] The Court stated:

---

8. The Court recognized "that there are authorities who think that the use of the phrase 'failure of consideration' in the context in which the appellant uses it, is a misnomer, as strictly speaking that phrase means lack of the consideration which is necessary to make an agreement

When a contracting party is displeased with the other's performance he may follow either of two alternative courses of action, if under the facts they are open to him: (1) he can reaffirm the existence of the contract and seek specific performance when appropriate or claim damages for its breach, or (2) *he can repudiate the contract altogether and request rescission.*

*Id.* at 75, 327 A.2d 477 (emphasis added; citations omitted.)

Because the Court determined that specific performance was not available to the buyer, it had to determine whether the buyer qualified "for any relief through rescission of the contract." *Id.* at 75, 327 A.2d 477. It ruled that Lazorcak's "failure to promptly and properly manifest his determination to repudiate the contract presents a hurdle which he does not surmount." *Id.* The Court reasoned, *id.* at 75–76, 327 A.2d 477:

Clearly a failure, to whatever degree, of a party to perform his part of a contract, though it may give rise to a suit for damages, does not in and of itself act to rescind that contract. Instead, as a general rule, the party seeking rescission must indicate to the other party at least the intent to restore the parties to the relative positions which they would have occupied if no such contract had ever been made, and this as soon as the disenchanted party learns of the facts. This offer of restoration or tender back must, at a minimum, demonstrate an unconditional willingness to return to the other party both the consideration that was given by that party and any benefits received under the contract. This effort to resume the status quo is required as, if a party who knows the facts which would justify rescission, does any act which recognizes the continued validity of the contract or indicates that he still feels bound under it, he will be held to have waived his right to rescind.

binding in the first place." *Id.* at 74, n. 4, 327 A.2d 477. (Citations omitted).

However, the Court explicitly acknowledged that, "in order that tender back does not become too harsh a requirement, there have been carved out in the law certain limited exceptions in which a contracting party may be excepted from the prerequisite that the parties be returned to the status quo." *Id.* at 77, 327 A.2d 477. The Court continued, *id.*:

These exceptions were delineated by this Court in *Funger v. Mayor of Somerset, supra*, 244 Md. at 151, 223 A.2d at 174, where it was stated:

"Equity will in an appropriate case order rescission without restoration if: (1) the performance by the one against whom rescission is sought has become worthless, or (2) the respondent has prevented its return, or (3) the performance conferred only an intangible benefit upon the complainant, or (4) only a promise was given, or (5) the complainant can properly retain it irrespective of the voidable transaction, or (6) it is in possession of or is subject to the order of a person having a right superior to the complainant, or (7) restoration is impossible for some reason not hereinbefore mentioned and the clearest and strongest equity demands that rescission be granted (sometimes with a monetary substitute for restoration). Restatement, Restitution §§ 65 and 66; Restatement, Contracts §§ 480 and 481; 3 Black, Rescission and Cancellation §§ 616–27."

The Court concluded: "[I]t is clear that the appellant cannot find refuge in any of the exceptions enumerated above...." *Id.* at 78, 327 A.2d 477. Therefore, said the Court, "he must show that he followed the abrogation and restoration requirements previously described." *Id.*

Appellant contends:

If [the] defendant in *Lazorcak* could not rescind his obligation to pay for the laundry business, due to an alleged breach and failure of consideration, while still keeping and enjoying the benefits of the laundry business, then the same legal principle, applicable to the instant case, is that Dr. Vanguri, having received, enjoyed and benefitted fully from

the total release of liability over and above the high end damage cap of $1,000,000, should not now be permitted to deprive Ms. Maslow of her quid pro quo, i.e., the low end damage floor of $250,000.... Without first offering to re-expose himself to liability over $1,000,000 (in a new trial), he should not be permitted to escape from his own *legal* duty to pay her $250,000.

In our view, appellant distorts the application of *Lazorcak.* When the parties entered into the Agreement, they made mutual promises, in open court, with neither party able to predict who would get the greater benefit of the promises. As appellee explains, had appellant abided by her promise not to appeal, Ms. Maslow "would have benefited [sic] greatly" from the Agreement. Given that Dr. Vanguri prevailed at trial, he would not have had *any* financial obligation to appellant, but for the Agreement.[9] Although Dr. Vanguri was fully prepared to hold up his end of the bargain by paying $250,000 to appellant, despite the jury's verdict, appellant wanted a "do-over" to obtain more than the $250,000; she sought to secure a re-trial by pursuing an appeal, in violation of the Agreement. Thus, as appellee explains, Dr. Vanguri did not "enjoy" the "only benefit Dr. Vanguri stood to gain" under the Agreement, which was "the benefit of finality, of having the whole ordeal over and done with."

In accordance with the exceptions articulated by the *Lazorcak* Court, appellee asserts that "the nature of the promises exchanged in the high/low settlement agreement do not leave Dr. Vanguri holding any benefit which he could return." We agree. Appellant's decision to breach makes restoration to the *status quo* impossible.

*Washington Homes, supra,* 281 Md. 712, 382 A.2d 555, is also pertinent. There, pursuant to a Sales Agreement, Washington Homes agreed to purchase and develop several hundred single family residential lots. *Id.* at 714, 382 A.2d 555.

---

**9.** Of course, absent the Agreement, appellant could have appealed. She did so, and appellee still prevailed.

"Disputes over the performance of the Sales Agreement led to litigation" in the circuit court, which the parties subsequently agreed to submit to arbitration. *Id.* The arbitrator "declared that the Sales Agreement 'between the parties, which was the subject matter of this arbitration, be rescinded and declared null, void and of no force and effect.'" *Id.* The circuit court upheld the arbitrator's award of rescission, and the Court of Appeals affirmed, based on the arbitrator's finding that Washington Homes "had repudiated the contract." *Id.* at 726, 382 A.2d 555. The Court stated, *id.* at 728, 382 A.2d 555: "Repudiation of a contract by one party gives the other party a choice of remedies." Further, the Court said: "Where ... there has been a material breach of a contract by one party, the other party has a right to rescind it." *Id.* at 728, 382 A.2d 555 (citations omitted).

Appellant seeks to distinguish *Washington Homes* from the case *sub judice*, stating:

First, while the buyer in *Washington Homes* failed to pay the full purchase price for the land, depriving seller from the very root of its bargain, and rendering buyer's performance still executory in nature, by contrast, Ms. Maslow did fully execute her duties by fully releasing Dr. Vanguri from all tort liability over $1,000,000 before the jury spoke, thereby giving him his root bargain, and leaving her with no further obligations to perform.

Second, while the seller in *Washington Homes* did equity, by offering to restore the buyer to the status quo ante with a full refund of all deposits plus interest, a "must," said the Court, for one seeking rescission, by contrast, Dr. Vanguri never offered to equitably restore Ms. Maslow to the status quo anti, [sic] which might have been accomplished by a proposal to re-try the case and re-expose himself to risk in excess of $1,000,000. This second distinction in *Washington Homes* is not highlighted to literally suggest that the parties should have to proceed to a new trial. Rather, it is underscored rhetorically only to point out that Dr. Vanguri never even made the equitable offer, as did the seller in *Washington Homes*.

We are not persuaded. After the jury returned its verdict, Ms. Maslow remained obligated to abide by her promise not to appeal. Appellant's repudiation of the Agreement left appellee free to pursue the remedy of rescission.

In addition, appellant directs us to *Ady v. Jenkins, supra,* 133 Md. 36, 104 A. 178. Ady's firm had a contract to sell to Jenkins all of the season's canned corn at a certain price, save for 1,000 cases. *Id.* at 37, 104 A. 178. Under the contract, Jenkins was obligated to provide the labels for the cans by a date certain, which Jenkins failed to do. *Id.* at 38–40, 104 A. 178. Meanwhile, because the price of corn had increased, Ady attempted to rescind the contract, claiming the failure to deliver the labels constituted a material breach. *Id.* at 38, 104 A. 178. Ady admitted "that he could not have used the labels," even had they been timely delivered, because insufficient quantities of corn had been packed, and that he had "labels left over from the previous year, which he could have used." *Id.* at 40, 104 A. 178. As the Court noted, the labels "were to be pasted on the cans after the corn had been packed in them, cooked and cooled, and so far as the packing operations were concerned that could have been done at any time even after the close of the season," as the parties had done "under similar contracts, for previous years." *Id.*

The Court of Appeals concluded that the failure of Jenkins to deliver the labels by the specified date was "not of the essence," *id.* at 40, 104 A. 178, and therefore Ady was not entitled to repudiate his obligation to sell the corn to Jenkins. As the Court said, a breach of a merely subsidiary provision "will not as a rule, relieve the other party from such further performance as may be due from him under the contract and he is left to his remedy by an action for compensation in damages." *Id.* at 39, 104 A. 178. Nevertheless, the Court also said, *id.* at 38, 104 A. 178: "The law is well settled that when there has been a substantial breach of a contract the other party has a right to rescind the contract or to refuse to perform his part, and sue for damages." (Citations omitted.)

*Contract Materials Processing, Inc. v. KataLeuna GmbH Catalysts,* 303 F.Supp.2d 612 (D.Md.2003), is also instructive.

That case involved an agreement to sell oil refining technologies that were warranted as patentable and therefore valuable in the oil refining industry. *Id.* at 652. After the buyer paid a significant deposit and possession of the technologies was transferred, the buyer discovered that another company already held the patent. *Id.* Anticipating that the buyer would sue, the seller filed suit, alleging breach and seeking the balance of the purchase price as damages. *Id.* at 613. The buyer counterclaimed, seeking rescission "because the technology transferred under the agreement was demonstrably ineffective and/or unpatentable because the technology was not new and unobvious." *Id.* at 613–14. The court determined that rescission was "wholly warranted" as "an appropriate remedy." *Id.* at 614. It reasoned that the seller "knowingly and/or recklessly misrepresented material facts surrounding the likely effectiveness of the technologies" and "specifically breached contractual warranties that were critical" to the buyer's decision to enter into the sales agreement. *Id.* In upholding the buyer's right to rescind, the court concluded: "Rescission is appropriate where there is a substantial breach of a contract that destroys the main object of that agreement." *Id.* at 653 (citing *Plitt v. McMillan, supra*).

In its "Conclusions of Law," the federal court stated:

43. Return of the parties to their pre-contractual positions is not an absolute prerequisite to the equitable remedy of rescission.

44. Indeed, "where on the particular facts it seems equitable to allow rescission without complete or perfect restoration of consideration, the modern tendency is to allow the relief."

45. Therefore, "where the consideration [received] is without value," or is "worthless . . . as a result of its own defects," there is no requirement to restore it to the breaching party.

*Id.* at 654 (citations omitted).

As appellee points out, "part of the consideration given Dr. Vanguri, a promise not to collect on a verdict in excess of

$1,000,000, turned out to be worthless since no such verdict was returned." The only other valuable consideration provided by appellant was her promise not to appeal. That, too, "turned out to be worthless," in light of appellant's repudiation of that promise.

Appellant also looks to *Speed v. Bailey, supra,* 153 Md. 655, 139 A. 534, claiming that it, too, supports her contention that appellee's "legal remedy . . . is not rescission, but is instead a claim for damages only, to the extent that he can prove any."

Speed agreed to sell to Bailey a plot of land and to build a bungalow on it. *Id.* at 657, 139 A. 534. About two months after making the down payment, Bailey complained that Speed "had not fully complied with their contract to build a house according to the written and oral specifications." *Id.* at 658, 139 A. 534. Therefore, Bailey argued that he was entitled to rescind the contract and recover his initial payment of $2,000. *Id.* Bailey sued, alleging breach, for which he sought rescission and recovery of his deposit. Speed acknowledged that he "promised to do certain of the things complained of as not having been done," and expressed his "willingness and ability . . . to perform all that he admits he promised to perform."

Although Bailey prevailed in the trial court, the Court of Appeals reversed. *Id.* at 656, 139 A. 534. It stated, *id.* at 660, 139 A. 534:

Before partial failure of performance of one party will give the other the right of rescission, the act failed to be performed must go to the root of the contract, or the failure to perform the contract must be in respect to matters which would render the performance of the rest a thing different in substance from that which was contracted for.

Notably, the Court recognized that, "when there has been substantial breach of a contract, the other party has a right to rescind the contract *or* to refuse to perform it and sue for damages." *Id.* at 661, 139 A. 534. The *Speed* Court "reached the conclusion that the rule of substantial compliance is a complete defense to the action as made out by the declaration. . . ." *Id.* at 662, 139 A. 534.

Here, appellant cannot show the kind of substantial compliance that, in *Speed,* warranted damages rather than rescission for injuries "sustained from the breach." *Id.* at 663, 139 A. 534. Appellee promised to pay appellant $250,000, even if he won, as long as she did not appeal. Appellant's appeal amounted to a repudiation of the contract and constituted a substantial, material breach. *See also City of Baltimore v. Industrial Electronics, Inc.,* 230 Md. 224, 229–30, 186 A.2d 469 (1962) (cited by appellant and including a general recitation of the law, to the effect that a breach must be substantial in order to justify rescission; stating "that before partial failure of performance of one contracting party will give the other a right to rescind, *the failure must go to the root of the contract or be in respect to matters which would render the performance of the rest a thing different in substance from that which was contracted for*")(emphasis added); *Talbert v. Seek,* 210 Md. 34, 44, 122 A.2d 469 (1956) (reiterating: " 'It is, of course, beyond question that *a contract may be mutually rescinded either by express agreement or by any act or course of conduct of the parties which clearly indicates their mutual understanding that the contract is abrogated.* It is also accepted that where there is a *mutual rescission of a contract,* the parties are entitled to be placed *in statu quo* as far as possible ....' ") (emphasis added; citation omitted); *Foster–Porter Enterprises v. DeMare,* 198 Md. 20, 36, 81 A.2d 325 (1951) (cited by appellant for the proposition "that contracts may not be rescinded, absent 'good, sufficient and valid' reasons," and stating: "Unless a contract provision for termination for breach is in terms exclusive, it is a cumulative remedy and does not bar the ordinary remedy of termination for 'a breach which is material, or which goes to the root of the matter or essence of the contact.' ") (citations omitted); *McKeever v. Washington Heights Realty Corp.,* 183 Md. 216, 226, 37 A.2d 305 (1944) ("If one party is guilty of a substantial breach of contract, the other party has the right to treat the contract as rescinded ....").

Finally, we consider appellant's claim that the remedy of rescission was extinguished because appellee did not seek a

dismissal of the appeal in *Maslow I.* Appellant cites *Mackey v. Daniel,* 59 Md. 484 (1883), as authority for her assertion that appellee was required in *Maslow I* to file a motion to dismiss the appeal and, by electing not to do so, he waived his right to rescind.

Mackey involved a legatee's promise that, in exchange for the immediate distribution of his share of an estate, he would "waive" his right to file an appeal. 59 Md. at 486. The Court held that the promise not to appeal was enforceable. *Id.* at 492. It stated, *id.* at 488–89:

> That this contract on the part of the executors on the one side to agree to the immediate distribution of the estate, and on the part of the residuary legatees to waive their right of appeal, is supported by a sufficient legal consideration we do not think there can be a doubt. The surest test to be applied to this agreement is the rule of mutuality.

We are reminded of what the Court said in *Washington Homes,* 281 Md. at 728, 382 A.2d 555: "Repudiation of a contract by one party gives the other party a *choice* of remedies." (Emphasis added; citations omitted.) Appellee's defense of the appeal in *Maslow I* did not bar his right to oppose appellant's motion to enforce the Agreement. Indeed, appellant did not even file her motion until after she lost her appeal. Thus, appellee had no way to know that, upon losing the appeal, appellant would persist in her attempt to enforce the Agreement.

Moreover, in appellant's first appeal, this Court explicitly noted the terms of the Agreement, including the provision "not to appeal," the pendency in the circuit court of the motion to enforce the Agreement, and that *"[t]he parties agree that the effect of that agreement is not before this court in this appeal."* (Emphasis added.)

## CONCLUSION

Appellant contends that appellee promised the "$250,000 as a hedge against the greater risk of losing over $1,000,000," and that Dr. Vanguri "should not now, post-verdict, be permit-

ted to reassess the value of the risk he had earlier bargained to minimize." In "gambler's parlance," appellant accuses appellee of "past-posting." In our view, however, appellant is the one who reassessed the risk.

After the trial began, appellant entered into the Agreement with the advice of counsel. Yet, she flagrantly violated the terms of the Agreement by noting an appeal to this Court after she lost at trial. Appellant mistakenly believes that "she was free to breach the promise not to appeal without penalty," and erroneously asserts that "Dr. Vanguri would not have been harmed by having to go through a second malpractice trial because the courts probably would not have let her breach her promise not to seek more than the high limit." We see it differently.

Despite appellee's exoneration by the jury, he was contractually obligated to pay $250,000 to appellant, so long as appellant did not appeal in violation of the Agreement. If appellant had prevailed on appeal, resulting in a retrial and possible exposure of appellee to a verdict up to $1,000,000, appellee's exoneration at trial would have been the ultimate Phyrric victory.

We agree with appellee that "[t]he whole point of a high/low settlement agreement is to limit the parties' exposure to prescribed paramet... *once and for all. Finality is integral to the whole point of this contract,* as is the case in nearly all settlement agreements." (Emphasis added.) In this light, "the equities are such that [appellant] should not be permitted to enforce" the Agreement; appellant cannot "have her cake and eat it too."

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**